[No. A113017. First Dist., Div. Four. Aug. 19, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
ROLANDO S. MENESES, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION[*]]**

[*]Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of Discussion, parts C. through F.

1650

## COUNSEL

Dale Dombkowski, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman and John R. Vance, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SEPULVEDA, J.**—A jury convicted defendant Rolando S. Meneses of multiple crimes related to his participation in a scheme to defraud insurance companies. Defendant was accused of buying stolen police accident reports, using information from those reports to contact accident victims, referring the victims to attorneys and chiropractors (for which defendant collected fees), and encouraging the victims to inflate their insurance claims by receiving unnecessary medical treatment. A jury convicted defendant of stealing public records (Gov. Code, § 6200); referring business for purposes of insurance fraud (and attempting the same) (Pen. Code, §§ 549, 664); making false or fraudulent insurance claims (Pen. Code, § 550, subd. (b)(2)); receiving a referral fee in connection with an insurance claim (Ins. Code, § 750); and conspiring to steal public records and to commit insurance fraud (Pen. Code, § 182, subd. (a)(1)). The court stayed sentence on the conspiracy counts (Pen. Code, § 654) and sentenced defendant to an aggregate prison term of five years. We affirm the judgment.

## FACTS[1]

In his testimony at trial, defendant admitted that he operated what he called a "lawyer referral service," in which law firms and chiropractors paid him money to refer people for services. Initially, defendant used information from connections inside San Francisco General Hospital to locate injured people. Later, defendant obtained "leads" for his referrals from San Francisco Police Department traffic collision reports. Defendant testified that he obtained the front page of the police reports, which usually identifies the parties involved in the collision, lists insurance information, states any vehicle code violations, and specifies whether the party not at fault was injured. Defendant said he bought the police reports from Enrique Lim, for $500 a week. Lim got the reports from his domestic partner, Susana Esquivel, who was a clerk-typist at the police department. Esquivel knew it was illegal to remove reports from the department. Esquivel never met defendant, and defendant claimed he never knew how Lim got the reports.

On cross-examination, the prosecutor asked defendant if he thought it was appropriate that he receive a police accident report, with personal information, and defendant said, "it's a public record. So what's the big difference of that? Anybody could get that." Defendant explained that he used to obtain accident reports from the police department when he worked in a lawyer's office, when he presented a request for the report with the accident victim's authorization. The prosecutor asked, "you can't get a police report without that kind of authorization, can you?" Defendant responded evasively, and continued to evade the issue during subsequent examination. Eventually, defendant said he "could not remember" if, in the late 1990's, an outside party could obtain an accident report.

The prosecutor also asked defendant about his handling of the reports. When the police searched defendant's home, they found 128 police reports. About half of those reports were found in a stack of folders placed in a backyard barbeque kettle upon briquettes and lighter fluid. Defendant denied the prosecutor's accusation that he wanted to be able to torch evidence with a moment's notice and claimed he was going to use the old reports as waste paper to light the charcoal for a barbeque. When the prosecutor pointed out that the reports were on top of the briquettes, not under them, defendant's only reply was that he did not intend to use the barbeque that day, but was readying it for the weekend (the search was on Wednesday).

---

[1] We do not attempt to recount all the facts presented in a 27-day trial and instead summarize those facts necessary for an understanding of the issues on appeal.

Defendant testified that he used the police reports he bought from Lim to contact the innocent party in a vehicle accident and urge him or her to hire a lawyer, see a chiropractor, and file an insurance claim. The client needed to see a chiropractor to prove to the insurance company that he or she was hurt. The lawyer received one-third of the insurance settlement and the client received the rest, after deduction of the chiropractor charges. Defendant had a referral arrangement with "[a] lot of lawyers." In the 1990's, he worked with 10 to 20 lawyers. Defendant was "paid well" by lawyers for the referrals, and was sometimes paid an additional amount by the chiropractors. In the late 1990's, lawyers paid defendant $1,000 for each referred client, usually in cash. Chiropractors paid $300 for a referral. If a person defendant referred to a lawyer did not go to the chiropractor, document injuries, and obtain a settlement, defendant would not get credit for the referral (his next referral would be unpaid).

Defendant described himself as a salesman who assisted people in filing insurance claims. Defendant maintained that it was never his intention to commit fraud, or to encourage others to commit fraud. Defendant said he thought it was legal to refer clients to lawyers for money. Defendant testified that his belief was based on advice from an attorney, Wayne Joyner, to whom he referred clients, and on advice received from a telephone inquiry to the State Bar of California. Defendant testified that a few other lawyers he worked with also told him it was legal to refer clients to them, but defendant "could not remember" which lawyers. Defendant testified that he also thought it was legal to refer patients to chiropractors for money. Defendant did not claim that anyone advised him on this matter, when cross-examined on the subject. Instead, defendant said, "it's common sense. I give them business, I deserve to be paid too." Later, on redirect, defendant said that Attorney Joyner told him it was "okay" to refer cases "to both lawyers and doctors," as long as defendant obtained a business license. Defendant said he obtained a license, and operated under the fictitious business name, Legal Network Services.

Attorney Joyner, the one lawyer defendant identified as advising him that referrals were legal, denied ever rendering that advice. Joyner said he discussed a business license for Legal Network Services only in the context of tax treatment of corporations versus individuals.

On cross-examination, defendant admitted that he did not keep account books for the business he claimed was legitimate. Defendant's only explanation for not keeping records of the money he received for referrals was: "I'm lazy." Defendant also admitted that he was previously convicted of conspiring to pass forged immigration documents, a federal felony. The prosecutor also impeached defendant with his 1992 deposition testimony in a civil proceeding. Despite defendant's testimony in this case that he had been referring

cases to lawyers for money since 1990, and always believed it legal, at that deposition defendant disavowed the practice. When deposed in 1992, defendant said he did not know that there are people who sign up potential clients for law firms. At that time, defendant said he had "nothing to do with" law firms paying money for referrals. Defendant offered several explanations for his prior testimony, including that he was not feeling well, did not know what the examiner was talking about, and was only a witness so should not have been "asked about the rest of [his] life."

MARA MAMET

NOVEMBER 1997 ACCIDENT

Defendant's "lawyer referral service" was uncovered in late 1997, when he solicited accident victim Mara Mamet, who happened to be a lawyer with the California State Bar responsible for investigating lawyer misconduct. In November 1997, a drunk driver hit Mamet's vehicle as she sat at a red light. A police officer prepared an accident report that did not list Mamet's occupation. Defendant paid Lim for Mamet's accident report filed with the San Francisco Police Department.

A couple weeks after the accident, defendant left a message on Mamet's telephone answering machine. Defendant said that he had good news, could help her, and called himself her "guardian angel." Mamet suspected that defendant was a "capper" (one who solicits business for lawyers). Mamet knew it was illegal and unethical for a lawyer to pay someone to solicit business, and had prosecuted lawyers for the offense. Mamet called defendant back to investigate the matter. When they spoke, defendant said he knew she was a victim and that he could help her get money. Defendant asked to come to her apartment that night, and she arranged to meet him the next day at a café.

The next morning, Mamet contacted law enforcement authorities. It was agreed that an investigator for the San Francisco District Attorney's Office would pose as Mamet in meeting with defendant. The investigator, Brenda Deluca, met defendant at the café. Defendant, immediately upon meeting her, said he could tell her neck was sore by the way she moved. But Deluca was uninjured, the accident report did not list any neck injury, and Deluca had not complained of a sore neck. Deluca was given business cards for a chiropractor and lawyer. Defendant told her to "just keep seeing the doctor," and to tell her insurance company that she has a lawyer and the insurer must talk to the lawyer. Defendant said: "They are basing the claims on the medical bills. More medical bills is more money for you." Defendant explained: "[b]ecause the lawyer [is] not going to get anything if there's no medical bills. There's

no basis on the claim." Deluca asked: "What if the chiropractor says, oh you're okay and, and tells me to go home?" Defendant advised: "just keep complaining." Deluca asked if she should keep complaining "[e]ven if it doesn't hurt that much." Defendant replied: "Yeah. Just keep complaining, okay?"

Deluca went to the referred chiropractor. She told the doctor that she had been in an accident and had a sore neck. The chiropractor examined her and she received treatment: massage and cold packs. She returned two more times with complaints of soreness and received the same treatment. On her fourth visit, Deluca said she felt fine and the doctor closed the case.

### Eric Fedeler

#### December 1997 accident

Eric Fedeler was involved in a traffic accident on December 11, 1997, and provided information for a police report. Defendant telephoned Fedeler the next day offering legal services. Fedeler met with defendant, and defendant told Fedeler to see a chiropractor and that he "would need big bills for a big settlement." Fedeler said he did not have any neck or back pain and defendant said, "let the doctor take care of that." Fedeler asked defendant how he got his personal information, and defendant said he got information from ambulance companies, police, tow truck drivers, or hospitals. Fedeler pressed defendant on exactly how he got his information and defendant replied, " '[i]n America we can get these things,' " and gestured that he paid for the information by rubbing his fingertips against the pad of his thumb. Fedeler believed defendant was running a scam to cheat insurance companies, and refused defendant's offered services.

### Isaac Rodriguez

#### January and March 1998 accidents

Isaac Rodriguez had two accidents riding as a bike messenger in 1998. In January 1998, he collided with a car entering an intersection and fell to the ground with bumps, bruises, scrapes, and a swollen knee. The police took an accident report, which defendant bought from Lim. Shortly after the accident, Rodriquez received a call from defendant saying he wanted to connect Rodriquez with a lawyer and doctor to get compensation for the accident. Defendant told Rodriguez that he should receive medical treatment, and that the amount of money he would get was related to how many times he went to therapy. Rodriguez asked, "what if the doctor says there's nothing wrong with me," and defendant said, "you can't x-ray pain. You can't tell someone their

pain doesn't show up on a chart, therefore, it's not there." Rodriguez was suspicious and discussed the call with his boss. Rodriguez was then contacted by insurance investigators, and he agreed to cooperate with them.

Rodriguez set a meeting with defendant but, after Rodriguez cancelled a couple times, he was met by Leila Cordova who worked with defendant. Rodriguez signed an attorney retainer agreement and Cordova urged him to see a chiropractor. Cordova said the settlement is based on the medical bills. Rodriguez said he had only a scratch and did not feel any discomfort. Cordova said he would not feel pain now but would probably feel it in about a week. When parting, Cordova told Rodriguez that if he wanted a good settlement, he would have to tell the doctor that there is really something wrong. She said "you can't find that on an x-ray or whatever," and "[t]hey have to take your word for that."

Rodriquez was in a second accident, on March 29, 1999, when he was struck by a car door opened in his bicycle's path. Rodriguez suffered a broken collarbone and provided information to the police. Within a couple of days, defendant telephoned and arranged to meet with Rodriguez. The meeting was recorded. Defendant referred Rodriguez to a lawyer and chiropractor. Defendant advised Rodriguez that the "[m]ore medical visits you make is more money that you will take." Defendant told Rodriguez to go for therapy three times a week. Defendant said: "Forget those broken bones for awhile. Okay? [¶] . . . [¶] Let's say whiplash."

JOHN ARGUELLO, ALSO KNOWN AS JUAN MARTINEZ

FEBRUARY 1998 ACCIDENT

Insurance investigator John Arguello posed as "Juan Martinez" on a traffic collision report fabricated by the San Francisco Police Department. The police report stated, regarding Arguello and his two passengers involved in the accident, "[c]omplaint of pain, seek own care." Two days after the fictional accident, defendant called and offered legal services. At a recorded meeting, defendant said that the basis of the case is medical, and that Arguello needed to see a doctor regularly. Defendant said, "to have a good settlement, you need to go 25 to 30 times." Defendant assured Arguello that the treatment would be just a massage and ice pack. Arguello asked how much he, and the passengers in his car, could "get out of this." Defendant said he did not know how much they would "build up" but estimated a recovery in the range of $75 to $200 per doctor visit. Arguello asked if there was a chance the doctor would say Arguello was fine after five visits, and defendant said, "no" and "just keep complaining." Defendant added later, "remember that they are in the business also." "They want their patients to keep coming in so they can bill the insurance company as many as you can."

Defendant suggested that Arguello, who posed as self-employed, should also "[m]ake a note that you have a loss of income" and submit it to the lawyer. Defendant also referred Arguello to an automobile body shop. At another recorded meeting, Arguello said that he had unrelated damage to the same car from another accident that was hit-and-run and asked, "is there something we can do about this?" Defendant advised Arguello, when he took the car to the body shop for an insurance estimate: "Keep your mouth shut and let them see the damage. Don't say anything." Defendant explained that getting coverage for unrelated damage is "a fraud so you don't want to say anything that's not appropriate."

Arguello went to the chiropractor for about 10 treatments, and then the chiropractor said he was closing the case. In a recorded telephone call to defendant about the situation, defendant told Arguello to go back and complain of pain again. "[J]ust tell them it still hurts," defendant said. When Arguello returned to the chiropractor, the chiropractor smiled and said, "[t]he pain just came back, huh?," and laughed.

The law firm to which defendant referred Arguello settled Arguello's insurance claims for vehicle damage and personal injuries, and forwarded checks to him. Arguello received a total of $4,056.83, which Arguello returned to the insurer at the conclusion of his investigation.

### Francisco Solorio

#### April 1998 accident

In April 1998, 17-year-old Francisco Solorio was in a traffic accident; a driver rear-ended Solorio's car as he was double-parked to drop off a friend. A police report was filed. Defendant telephoned Solorio about the accident and Solorio's mother, thinking defendant was associated with her insurance company, agreed that she and her son would meet him. Defendant referred Solorio to a lawyer and chiropractor. Defendant said that Solorio and his friends, who were passengers in the car, needed to go to the chiropractor he recommended, and would have to make 25 or 30 visits. Solorio's mother said, "[w]hy so many? The kids are not, you know, that hurt." Defendant said, "[t]hat's the procedure. You even don't have to go exactly and see the chiropractor. You just sign in and take off. You don't have to go to the appointment." Solorio's mother refused defendant's services.

### Mei Young

#### September 1998 accident

Mei Young was in a vehicle collision in September 1998, and reported the accident to the police. Defendant bought the police report from Lim and,

within a couple days of the accident, defendant telephoned her and left a message to return his call. Young returned the call and defendant said he knew Young was in an accident and asked if she needed a lawyer and doctor. Young was suspicious and asked who he was and how he got her telephone number. Defendant said he worked for Bay Area Legal Services, and got her number from the hospital. Young told him she did not go to the hospital and defendant then said he got her number from the Internet. Young did not believe him, and defendant grew impatient and hung up the telephone. Young called the police and reported the incident.

Police Officer John Balma telephoned defendant to investigate. Balma told defendant that he had information that defendant was trying to solicit an insurance claim and defendant was reportedly getting victim information from hospital, ambulance, or towing records. Balma said he did not believe defendant could obtain information from such records. Defendant "became arrogant" and said, "well, this is where I get the information." Balma expressed disbelief and said, "I can turn this over to the District Attorney's office." Defendant replied: "you can do whatever you want." At some point in the conversation, defendant became "defensive" about how he obtained information and said something like, "I'm not doing anything wrong." Balma referred the matter to the district attorney.

VERA VILLARREAL-NOVERO, ALSO KNOWN AS VERA GONZALEZ

SEPTEMBER 1998 ACCIDENT

Insurance investigator Vera Villarreal-Novero posed as "Vera Gonzalez" on a traffic collision report fabricated by the San Francisco Police Department. Defendant bought the report from Lim. Defendant contacted Villarreal-Novero about filing an auto insurance claim, and they agreed to meet at a restaurant. The meeting was recorded. In the meeting, defendant said his job was to make sure that Villarreal-Novero was compensated for her accident. Defendant said, "[j]ust keep seeing the doctor. Okay? Every time that you go to see the doctor the insurance company will pay a hundred to two hundred dollars per visit." Villarreal-Novero asked: "[n]ow is the doctor gonna realize that I don't feel bad? I mean I told you on the phone that I don't feel bad." Defendant said, "[y]eah, I know." Villarreal-Novero asked: "Will the doctor realize that or what am I supposed to tell the doctor?" Defendant replied: "No, No. [J]ust tell him you injured your back okay? They can not, they're not going to say anything because this is a whiplash they're going to do just, just a massage."

Villarreal-Novero said she was looking for work and needed money, so it would really help if she could get money on the insurance claim. Defendant

suggested that he might find her a job in a lawyer's or doctor's office. Villarreal-Novero expressed interest but said she needed to make enough money to make ends meet. Defendant asked, "[h]ow would you like a thousand dollars a week?," and suggested that she work with him getting clients for lawyers and volunteering at San Francisco General Hospital to make contacts. Defendant said his business makes $100,000 a year.

VERDICT

The jury found defendant guilty of nine counts of conspiracy with the police clerk-typist Esquivel (and certain others). The counts were based on the theft of separate accident reports and defendant's contact with individual accident victims, Mamet (count 1), Fedeler (count 5), Rodriquez (Jan. 1998 accident, count 8), Arguello (count 11), Solorio (count 17), Young (count 20), Villarreal-Novero (count 22), Rodriguez (Mar. 1999 accident, count 25), and additional stolen reports (count 28). (Pen. Code, § 182, subd. (a)(1).) On each conspiracy count, the jury found that the object of the conspiracy was to commit theft of public records. (Gov. Code, § 6200.) Five of these counts included an additional target offense or offenses, including referral of business for purpose of insurance fraud (Pen. Code, § 549), and making false or fraudulent insurance claims (Pen. Code, § 550, subd. (b)(2)).

The jury also found defendant guilty of eight counts of the substantive offense of stealing public records, namely the traffic collision reports for accident victims Mamet, Fedeler, Rodriguez (two reports), Arguello, Solorio, Young, and Villarreal-Novero. (Gov. Code, § 6200.)

Defendant was likewise found guilty of four counts of referring business for purpose of insurance fraud (plus one count for attempt with Villarreal-Novero) and acquitted of a count for this offense concerning Mamet. (Pen. Code, §§ 549, 664.) The jury reached no decision on this offense concerning Solorio.

Defendant was convicted of two counts of assisting in the making of false or fraudulent insurance claims (Arguello). (Pen. Code, § 550, subd. (b)(2).) He was acquitted of this offense concerning Mamet. Lastly, the jury found defendant guilty of one count of an unlawful referral in connection with an insurance claim ("capping"). (Ins. Code, § 750.)

SENTENCING

The prosecutor proposed an eight- or 10-year prison sentence. The court rejected the proposal and sentenced defendant to an aggregate prison term of five years. The court imposed three years for assisting in the making of a

false or fraudulent insurance claim (count 14), plus two consecutive one-year terms for stealing public records (counts 2 and 6). The court stayed sentence on all conspiracy counts and the capping count (Pen. Code, § 654), and made all other counts concurrent.

## DISCUSSION

Defendant raises a number of claims on appeal: (1) the court, on its own initiative (sua sponte), should have instructed the jury on mistake of law and mistake of fact as defenses to all criminal charges because there was evidence that defendant "did not think he did anything wrong"; (2) the court, sua sponte, should have instructed the jury to decide whether the separately charged conspiracies were truly separate conspiracies or only one overall conspiracy; (3) the prosecutor, in her closing argument to the jury, improperly referred to evidence outside the record by suggesting she had enough evidence to charge defendant with 80 criminal counts instead of the 28 charged in the indictment, and also wrongly implied her personal belief in defendant's guilt by saying it is her "ethical duty" not to charge someone unless one is guilty; (4) the court should have sanitized defendant's prior conviction for the felony of conspiring to forge immigration documents, by eliminating all reference to conspiracy when the prosecutor impeached defendant's credibility as a felon; (5) insufficient evidence supports convictions based on stealing police accident reports because only photocopies of the reports were stolen; and (6) trial counsel was ineffective in failing to request essential jury instructions, failing to object to the prosecutor's closing argument, and failing to argue that it is legal to take photocopies of police reports. We discuss these claims in turn.

### A. *The court had no duty to instruct on mistake of law or mistake of fact*

■ Defendant first claims that the court had a duty to instruct, sua sponte, on mistake of law and mistake of fact as defenses to all criminal charges because there was evidence that defendant "did not think he did anything wrong." The claim fails for two reasons. First, a mistake of law (mistakenly thinking one's conduct is legal) is rarely a defense to criminal prosecution, and has limited application here. Second, to the extent a mistake of fact defense applies, defendant fails to satisfy the standards for invoking instructional duties. ■ A trial court's duty to instruct sua sponte on particular defenses arises " 'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' " (*People v. Barton* (1995) 12 Cal.4th 186, 195 [47 Cal.Rptr.2d 569, 906 P.2d

531].) Defendant satisfies neither prong of this test.[2] We begin with an overview of the principles of mistake of law and fact.

### 1. *General principles of mistake of law and mistake of fact*

■ "For criminal liability to attach to an action, the standard rule is that 'there must exist a union, or joint operation of act and intent, or criminal negligence.' " (*In re Jennings* (2004) 34 Cal.4th 254, 267 [17 Cal.Rptr.3d 645, 95 P.3d 906], citing Pen. Code, § 20.) Generally, the prosecution must prove some form of guilty mental state. (*In re Jennings, supra*, at p. 267.) A defendant may refute guilt by showing a mistake of fact disproving criminal intent. (*Id.* at pp. 276–277.) A person is usually considered incapable of committing a crime if he or she "committed the act or made the omission charged under an ignorance or mistake of fact, which disproves any criminal intent." (Pen. Code, § 26.) As examples, a reasonable yet mistaken belief that the victim consented to sex is a defense to forcible rape (*People v. Mayberry* (1975) 15 Cal.3d 143, 153–158 [125 Cal.Rptr. 745, 542 P.2d 1337]); a good faith and reasonable belief that the complaining witness was at least 18 years old is a defense to statutory rape (*People v. Hernandez* (1964) 61 Cal.2d 529, 530–536 [39 Cal.Rptr. 361, 393 P.2d 673]); and a defendant's bona fide and reasonable belief that he was divorced is a defense to bigamy (*People v. Vogel* (1956) 46 Cal.2d 798, 803 [299 P.2d 850]). As our Supreme Court observed: " ' " 'At common law an honest and reasonable belief in the existence of circumstances, which, if true, would make the act for which the person is indicted an innocent act, has always been held to be a good defense.' " ' " (*In re Jennings, supra*, at p. 279.)

■ In determining whether a defendant's mistaken belief disproves criminal intent, the courts have drawn a distinction between mistakes of fact and mistakes of law. (*People v. Snyder* (1982) 32 Cal.3d 590, 592–593 [186 Cal.Rptr. 485, 652 P.2d 42].) While a mistake of fact usually is a defense, a mistake of law usually is not. It is commonly said that ignorance of the law is no excuse. (*People v. Cole* (2007) 156 Cal.App.4th 452, 483 [67 Cal.Rptr.3d 526].) "[I]n the absence of specific language to the contrary, ignorance of a law is not a defense to a charge of its violation." (*Hale v. Morgan* (1978) 22 Cal.3d 388, 396 [149 Cal.Rptr. 375, 584 P.2d 512].) "If the act itself is punishable when knowingly done, it is immaterial that the defendant thought

---

[2] The People say there is never a sua sponte duty to instruct on mistake of law or fact because such mistakes do not constitute a defense at all but, at most, a refutation of an element of the offense (intent) which may be the subject of a pinpoint instruction if requested. The People's argument, as the People acknowledge, is contrary to intermediate appellate court precedent, which recognizes sua sponte instructional duties for mistake defenses. (E.g., *People v. Urziceanu* (2005) 132 Cal.App.4th 747, 774–780 [33 Cal.Rptr.3d 859].) We need not address the People's criticism of this precedent, given our conclusion that a mistake defense is inapplicable on the facts here.

it was lawful." (1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Defenses, § 36, p. 367.) As an illustration: a defendant's ignorance of a girl's age may be a defense to statutory rape, but a defendant's ignorance of the law prohibiting sex with underage girls is no defense.

The distinction between mistakes of fact and mistakes of law is an "often difficult distinction." (*People v. Young* (2001) 92 Cal.App.4th 229, 233 [111 Cal.Rptr.2d 726].) The difficulty is acute where a defendant has a mistaken belief about legal status or rights. Where, for example, a defendant is charged with violating a foreign child custody order, is his mistaken belief that the custody order is unenforceable in California a mistake of fact or a mistake of law? The court in *People v. Flora* (1991) 228 Cal.App.3d 662, 669–670 [279 Cal.Rptr. 17], construed the claim as a mistake of law defense, which the court ultimately rejected because there was no evidence of a good faith mistake. Arguably, the claim could be understood as a mistake of fact defense—defendant claimed he was mistaken about the fact of the legal status of the custody order, not the existence of a law requiring compliance with court orders. It has been suggested that "[a]lthough concerned with knowledge of the law, a mistake about legal status or rights is a mistake of fact, not a mistake of law." (Judicial Council of Cal. Crim. Jury Instns. (2008) Bench Notes to CALCRIM No. 3407; contra, *People v. Snyder, supra*, 32 Cal.3d 590, 593 [mistake regarding legal status as a felon is a mistake of law, not fact, in prosecution for possession of a firearm by a felon].) Even if the claimed mistake in *Flora* was rightly construed as a mistake of law, the mistake was a collateral mistake about the nonpenal legal status of the foreign child custody order. Such mistakes are distinguishable from the strict understanding of a mistake of law where the defendant is mistaken about the penal law he or she is charged with violating.

There are a number of circumstances "in which violation of a penal statute is premised on the violator's harboring a particular mental state with respect to the nonpenal legal status of a person, thing, or action. In such cases, the principle is 'firmly established that defendant is not guilty if the offense charged requires any special mental element, such as that the prohibited act be committed knowingly, fraudulently, corruptly, maliciously or wilfully, and this element of the crime was lacking because of some mistake of nonpenal law.'" (*People v. Hagen* (1998) 19 Cal.4th 652, 660–661, fn. 4 [80 Cal.Rptr.2d 24, 967 P.2d 563], italics omitted.) "[T]he mistake must be one of *nonpenal* law. [Citation.] Thus, a taxpayer may defend against a [felony tax fraud] charge on the basis, for example, that he mistakenly believed certain deductions were proper under the tax laws, but not on the basis that he was unaware it was a crime to lie on one's tax return." (*Ibid.*, original italics.)

██ A mistake of law, in its strict sense, means ignorance that the penal law (of which one stands accused) prohibits one's conduct—and ignorance on

this point "is almost never a defense." (*People v. Hagen, supra,* 19 Cal.4th at pp. 660–661, fn. 4.) There are rare instances where ignorance that a penal law prohibits one's conduct *does* provide a defense. Those instances include crimes punishing the failure to act (rather than an affirmative act) and certain conspiracies. In *People v. Garcia* (2001) 25 Cal.4th 744, 751–754 [107 Cal.Rptr.2d 355, 23 P.3d 590], the California Supreme Court held that a defendant who claimed he was unaware of a law requiring sex offenders to register their residencies with the police was entitled to present that defense to the jury. The law punishes a willful failure to register, which is a failure to act. (*Id.* at p. 751.) In cases involving a mere failure to act, the defendant must know of the duty to act to be culpable. (*Ibid.*; cf. *People v. Barker* (2004) 34 Cal.4th 345, 358 [18 Cal.Rptr.3d 260, 96 P.3d 507] [no defense where defendant knew of the duty to register but "just forgot" to update his registration].) Ignorance that a penal law prohibits one's conduct may also provide a defense where one is charged with conspiracy to commit a crime that is not malum in se. (*United States v. Ehrlichman* (D.C.Cir. 1976) 178 U.S. App.D.C. 144 & fn. 17 [546 F.2d 910, 918–919].) "The essence of the crime of conspiracy is the 'evil' or 'corrupt' agreement to do an unlawful act. It is the evil intent that makes a combination criminally indictable 'The association of persons with an honest intent is not conspiracy, and one of the tests on a conspiracy trial is, did the accused act in ignorance without criminal intent? In other words, did they honestly entertain a belief that they were not committing an unlawful act?' [Citation.]" (*People v. Marsh* (1962) 58 Cal.2d 732, 743 [26 Cal.Rptr. 300, 376 P.2d 300].) In a prosecution for conspiracy to practice medicine without a license, the trial court erred in instructing the jury that criminal intent was present even if the defendants believed their conduct was lawful. (*Id.* at pp. 742–744.) However, the Supreme Court found that the error was not prejudicial because the evidence showed the defendants knew it was unlawful to practice medicine without a license. (*Id.* at p. 744.)

### 2. *Defendant's ignorance of the law is no excuse*

Defendant argues on appeal that his "entire defense was that he did not think he did anything wrong, that he was acting legally to help inexperienced genuinely injured insureds to assure proper medical treatment and to navigate the insurance settlement procedure," and that the trial court should have instructed the jury that defendant's good faith mistake about the legality of his conduct exonerated him.

Defendant's claim that he "did not think he did anything wrong" does not provide a cognizable defense to many of the crimes of which he stands convicted. Defendant's conviction for capping (count 16) was based on a law firm's payment to defendant for referral of insureds presenting damage claims. (Ins. Code, § 750.) It is immaterial that defendant supposedly believed it legal to refer insureds to lawyers and doctors. Defendant's belief is a

classic mistake of law that provides no defense: "ignorance of a law is not a defense to a charge of its violation." (*Hale v. Morgan, supra*, 22 Cal.3d at p. 396.) The trial court properly instructed the jury that a mistake of law is not a defense to the capping charge. The charge of conspiracy with capping as one of the target offenses (count 11) presents a different situation, as the trial court correctly recognized in its instructions to the jury. As noted above, " '[t]he association of persons with an honest intent is not conspiracy, and one of the tests on a conspiracy trial is, did the accused act in ignorance without criminal intent? In other words, did they honestly entertain a belief that they were not committing an unlawful act?' [Citation.]" (*People v. Marsh, supra*, 58 Cal.2d at p. 743.) In defendant's association with others, his asserted belief that they were not committing an unlawful act when referring insureds for fees was a defense to conspiracy, and the trial court properly instructed the jury on this point. The court advised the jury: "if you find that the defendant, in good faith, believed that capping was legal based on the advice of counsel, such belief would be a defense to that portion of Count 11, conspiracy that alleges the target offense of capping." The jury duly weighed this instruction and, in convicting defendant of conspiracy on count 11, selected other target offenses as objects of the conspiracy but not capping.

Defendant was also convicted of referring insureds to service providers with knowledge, or reckless disregard for whether, the insureds or service providers intended to present false insurance claims (counts 7, 10, 13, 24 [attempt], 27). (Pen. Code, § 549.) Defendant claims he "did not know it was illegal to refer with reckless disregard for whether . . . others would commit fraud." This is a classic mistake of law that is not cognizable as a defense. (*Hale v. Morgan, supra*, 22 Cal.3d at p. 396.) Likewise, it is no defense to defendant's convictions for assisting others in preparing false insurance claims (counts 14 and 15) that he supposedly "did not know it violated the law to assist a claimant to prepare a statement that contained false or misleading information." (See Pen. Code, § 550, subd. (b)(2).) " 'It is an emphatic postulate of both civil and penal law that ignorance of a law is no excuse for a violation thereof. Of course it is based on a fiction, because no man can know all the law, but it is a maxim which the law itself does not permit any one to gainsay. . . . The rule rests on public necessity; the welfare of society and the safety of the state depend upon its enforcement. . . . [If permitted] the plea [of ignorance] would be universally made, and would lead to interminable question incapable of solution. Was the defendant in fact ignorant of the law? Was his ignorance of the law excusable? The denser the ignorance the greater would be the exemption from liability.' " (*Hale, supra*, 22 Cal.3d at p. 396.) It would be absurd for the law to reward ignorance of legal duties. (*Ibid.*)

### 3. *The trial court had no duty to instruct on mistake of fact because the defense is contrary to defendant's position at trial and unsupported by the evidence*

Defendant's remaining convictions concern charges that he aided the theft of police reports (counts 2, 6, 9, 12, 18, 21, 23, 26) and conspired in their theft (counts 1, 5, 8, 11, 17, 20, 22, 25, 28). (Gov. Code, § 6200; Pen. Code, § 182, subd. (a)(1).) Defendant claims he mistakenly believed that the reports were open to the public and thus legally purchased from Lim, the domestic partner of a police clerk. Generously construed, this claim could be considered a cognizable defense, either as a mistake of fact or a mistake of law concerning the collateral matter of the nonpenal legal status of police records. (See *People v. Hagen, supra*, 19 Cal.4th at pp. 660–661, fn. 4 [mistake of nonpenal law may be defense].) As previously observed concerning mistakes of fact, " ' " '[a]t common law an honest and reasonable belief in the existence of circumstances, which, if true, would make the act for which the person is indicted an innocent act, has always been held to be a good defense.' " ' " (*In re Jennings, supra*, 34 Cal.4th at p. 279.) Arguably, defendant's claimed belief in the free access of police records presents circumstances that, if true, would make defendant's act of buying police records an innocent act.

But the trial court had no sua sponte duty to instruct on this mistaken belief the defense conjured on appeal. As noted above, a trial court's duty to instruct sua sponte on particular defenses arises " 'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' " (*People v. Barton, supra*, 12 Cal.4th at p. 195.) Here, defendant did not rely on a mistake of fact defense at trial, and the defense is both inconsistent with his theory of the case presented to the jury and unsupported by the evidence.

At trial, defendant claimed he did not know the source of the reports, not that he thought his source was legal. In closing argument to the jury, defense counsel argued: "[Defendant] doesn't know where the reports are coming from. He only knows that Enrigue Lim can provide them. That's what he knows. [¶] And he's not aiding and abetting anything. If he was paying Susana [Esquivel, the police clerk] and saying here is this for that, that's something different. But he's not aiding and abetting her to do anything." Defense counsel argued that defendant was "too far removed from the action to be criminally liable." Significantly, counsel effectively conceded that police reports are not publicly available by acknowledging that it would be illegal to pay a police clerk for them. This concession is inconsistent with defendant's appellate position that he believed anyone could legally obtain police reports.

Defendant's mistake defense, newly crafted on appeal, is also unsupported by the evidence. The facts strongly suggest guilty knowledge. Defendant claims that his testimony alone was enough to invoke the trial court's duty to instruct on a mistake defense, and points to his testimony that police accident reports are public records that anybody can get. A close reading of his testimony, however, shows that his initial claim of public access to police records was retracted under cross-examination.

Defendant asserted that an accident report is "a public record" that "[a]nybody could get." But defendant immediately limited his assertion by explaining that he obtained accident reports from the police department when he worked in a lawyer's office, after he presented a request for the report with the accident victim's authorization. The prosecutor pressed the point home: "you can't get a police report without that kind of authorization, can you?" Defendant responded evasively. He vaguely suggested that police policies and procedures had changed over time. The prosecutor focused her question on 1997 through 1999, the time relevant here, and defendant initially said anyone could get an accident report if one provided identifying information, such as the accident's date, location, and parties involved. The prosecutor challenged that testimony. She asked if it was defendant's testimony "that the requester need not make any showing of having a legitimate interest in that accident in order to get the report?" and defendant capitulated. He said he "could not remember about '97 to '99," and was talking about earlier years. This testimony fails to support a claim that defendant mistakenly believed the reports he obtained from 1997 to 1999 were publicly available.

Defendant argues that we are required to find sufficient evidence to support a mistake defense because the trial court expressed its opinion that defendant was mistaken about the legality of his conduct. Defendant places undue reliance on a peripheral comment by the trial court. The comment was made during a hearing on the prosecutor's motion to increase bail and to remand defendant into custody, made near the end of trial. The court found that defendant posed a substantial flight risk and granted the motion. In evaluating the flight risk, the court remarked that defendant "has a remarkable lack of remorse. He doesn't understand that he has committed a wrong, and I know that is going to be a jury decision. [¶] I've sat here—enthralled is too strong a word, amazed is too strong a word—but I've noticed the lack of remorse and the feeling of right . . . ." The court also said, "he actually thinks he did okay. He thinks that he acted legally and the Court knows that the jury will decide that issue."

On appeal, defendant misinterprets the trial court's comment as expressing a personal opinion that the evidence established a mistake defense to all crimes. The court's comment cannot be read so broadly. First, the comments

were made in the context of a bail hearing and were not intended as an authoritative pronouncement on the state of the evidence. Second, the court was commenting on defendant's self-righteous state of mind during the trial, not his state of mind at the time of the charged offenses. It is not unusual for a criminal defendant to rationalize his misconduct once accused and brought before a jury. Third, the court did not proclaim that defendant's "feelings of right" displayed at trial were supported by the evidence. Far from it. The court said: "I noted the lack of remorse and the feelings of right, which I'm not sure are justified by the evidence." Fourth, the court's reference to defendant's alleged belief in the lawfulness of his actions apparently referred to defendant's capping activities, not stealing police reports. As discussed above, ignorance that a penal law prohibits one's conduct may provide a defense where one is charged with conspiracy to commit a crime that is not malum in se. (*United States v. Ehrlichman, supra,* 546 F.2d at pp. 918–919 & fn. 17.) The court thus instructed the jury that a good faith belief that capping was legal was a defense to the conspiracy charged in count 11, which included the target offense of capping. The court's comments at the bail hearing are an apparent reference to defendant's defense to the capping conspiracy, as reflected in its statement that defendant "thinks that he acted legally and the Court knows that the jury will decide that issue." The comments cannot be fairly extended to all criminal charges. Nothing in the evidence or the trial court's comments supports defendant's appellate claim that the trial court had a duty to instruct on a mistake of fact defense.

B. *The trial court did not have a duty to instruct the jury to determine if there were multiple conspiracies, as charged, or a single conspiracy because the evidence did not support finding a single conspiracy*

The jury found defendant guilty of nine counts of criminal conspiracy. (Pen. Code, § 182, subd. (a)(1).) In special findings regarding the target offenses of the conspiracies, the jury found that defendant conspired to commit the following crimes: (1) theft of a public record (police accident report) for all nine counts (counts 1, 5, 8, 11, 17, 20, 22, 25, 28); (2) referring business for purpose of insurance fraud, or attempting the same, on five of the nine counts (counts 5, 8, 11, 22, 25); and making a false or fraudulent insurance claim on one count (count 11). Various coconspirators were alleged. The court stayed sentence on the conspiracy counts. (Pen. Code, § 654.)

Defendant seeks reversal of all conspiracy convictions. Defendant says the evidence could support a finding that there was a single conspiracy rather than multiple conspiracies. On this state of the evidence, defendant argues, the trial court erred in failing to instruct the jury sua sponte to decide whether there was one all-encompassing conspiracy (a conspiracy to commit insurance fraud, with the theft of police reports and referrals to lawyers and

doctors part of the scheme) instead of nine separate conspiracies. We conclude that the trial court does have a sua sponte duty to instruct the jury to determine if single or multiple conspiracies exist where the evidence supports alternative findings. However, the evidence here does not support a finding of a single conspiracy, so no instructional error occurred.

1. *The court has a sua sponte duty to instruct the jury to determine if single or multiple conspiracies exist if the evidence supports alternative findings*

California intermediate appellate courts are presently divided on whether the trial court has a duty to instruct the jury on single versus multiple conspiracies. (*People v. Jasso* (2006) 142 Cal.App.4th 1213, 1220 [48 Cal.Rptr.3d 697] (*Jasso*) [duty to instruct]; *People v. Liu* (1996) 46 Cal.App.4th 1119, 1133 [54 Cal.Rptr.2d 578] (*Liu*) [no duty to instruct]; *People v. McLead* (1990) 225 Cal.App.3d 906, 921 [276 Cal.Rptr. 187] (*McLead*) [no duty to instruct]; see CALJIC No. 17.05 [duty to instruct].) In *McLead*, the defendants were convicted of three counts of conspiracy to murder three rival drug dealers. (*McLead, supra*, at pp. 909–913.) On appeal, the defendants contended that the court should have instructed the jury to determine whether there were single or multiple conspiracies. (*Id.* at p. 921.) The *McLead* court rejected the contention, relying upon a solicitation to murder case. (*Ibid.*, citing *People v. Davis* (1989) 211 Cal.App.3d 317, 322–323 [259 Cal.Rptr. 348] (*Davis*).) The *Davis* case had rejected "the notion that the number of solicitations shown by the evidence is a question of fact for the trier of fact," and adopted the theory that there are necessarily as many solicitations as there are potential victims. (*Davis, supra*, at pp. 322–323.)

In *Liu*, the defendant was convicted of two counts of conspiracy to commit murder. (*Liu, supra*, 46 Cal.App.4th at pp. 1125–1127.) The intended victims were the defendant's gambling rival, and the rival's wife. (*Id.* at p. 1125.) The defendant believed his gambling rival had cheated him, and he wanted to kidnap the victims to extort money from them, then kill them. (*Ibid.*) On appeal, the defendant maintained that the evidence supported a finding that the planned murders were part of a single all-inclusive conspiracy. (*Id.* at pp. 1132–1133.) The defendant contended that the court erred in failing to instruct the jury to determine whether there were single or multiple conspiracies to murder the rival and his wife. (*Id.* at p. 1133.) Division Three of this district rejected the contention with the bare statement that the question was not one of fact, and thus the court did not err in failing to submit it to the jury for its determination. (*Ibid.*) The court based its holding on *McLead, supra*, 225 Cal.App.3d 906, and *Davis, supra*, 211 Cal.App.3d 317. (*Liu, supra*, at p. 1133.)

In *Jasso*, the defendant was a prison inmate who was convicted of three counts of conspiracy to smuggle drugs into prison. (*Jasso, supra*, 142 Cal.App.4th at p. 1215.) There was testimony at trial that the defendant, and another inmate, had an " 'ongoing business' " that used inmates' wives to bring drugs during prison visits. (*Id.* at p. 1220.) The appellate court reversed the judgment upon concluding that the trial court erred in failing to instruct on single versus multiple conspiracies. (*Id.* at pp. 1223–1224.) The court held: " '[a] trial court is required to instruct the jury to determine whether a single or multiple conspiracies exist . . . when there is evidence to support alternative findings.' " (*Id.* at p. 1220.) "Specifically, an instruction is warranted where the evidence could support a finding that there was one overall agreement among the various parties to perform various functions in order to carry out the objectives of the conspiracy." (*Ibid.*) The court relied upon a United States Supreme Court case explaining that " 'the precise nature and extent of the conspiracy must be determined by reference to the agreement which embraces and defines its objects. Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one.' " (*Ibid.*, citing *Braverman v. United States* (1942) 317 U.S. 49, 53 [87 L.Ed. 23, 63 S.Ct. 99].) The *Jasso* court noted the contrary line of authority holding that there is no duty to instruct on single versus multiple conspiracies (a line running from *Liu* to *McLead* and back to *Davis*). (*Jasso, supra*, at p. 1220, fn. 5.) The *Jasso* court did not discuss those authorities because the People, in *Jasso*, did not argue against a duty to instruct and instead argued that the evidence did not support an instruction in that individual case. (*Id.* at pp. 1220, fn. 5, 1222.)

Here, the People do argue against a duty to instruct on single versus multiple conspiracies. The argument is not illuminating. The People rely on the principle that a prosecutor has discretion to charge one or multiple conspiracies. The principle is unassailable, but off point. The prosecutor may bring multiple conspiracy charges, but the jury must determine if those charges are sustainable. The question is whether the jury, in weighing the prosecutor's allegations, must be instructed to determine whether single or multiple conspiracies exist when there is evidence to support alternative findings. We answer the question in the affirmative.

It is well settled that the essence of the crime of conspiracy is the agreement, and thus it is the number of the agreements (not the number of the victims or number of statutes violated) that determine the number of the conspiracies. As the United States Supreme Court stated long ago: "The gist of the crime of conspiracy . . . is the agreement or confederation of the conspirators to commit one or more unlawful acts . . . ." (*Braverman v. United*

*States, supra,* 317 U.S. at p. 53.) " 'The conspiracy is the crime, and that is one, however diverse its objects.' " *(Id.* at p. 54.) It is also widely stated that the question of whether the evidence shows a single conspiracy or multiple conspiracies is a question of fact for the jury to decide. (E.g., *People v. Morocco* (1987) 191 Cal.App.3d 1449, 1453 [237 Cal.Rptr. 113]; *U.S. v. Williams* (2d Cir. 2000) 205 F.3d 23, 32; *U.S. v. Hanzlicek* (10th Cir. 1999) 187 F.3d 1228, 1232; *U.S. v. LiCausi* (1st Cir. 1999) 167 F.3d 36, 45; *United States v. DiCesare* (9th Cir. 1985) 765 F.2d 890, 900; 15A C.J.S. (2002) Conspiracy, § 192, pp. 490–491.)

California cases stating that the question of single versus multiple conspiracies is *not* a factual question for the jury have a lone source, a source wholly unconcerned with conspiracy and the crime's distinct nature of punishing an *agreement* to act unlawfully. As noted above, *Liu* relied upon *McLead* and *Davis* in summarily stating that the question of single versus multiple conspiracies was not a question of fact, and holding that the court did not err in failing to submit the question to the jury for its determination *(Liu, supra,* 46 Cal.App.4th at p. 1133). *McLead* relied exclusively on *Davis, supra,* 211 Cal.App.3d 317. *(McLead, supra,* 225 Cal.App.3d at p. 921.) *Davis* is thus the ultimate source for this line of authority. *Davis* provides a weak foundation for the proposition that the question of single versus multiple conspiracies is not a question of fact because *Davis* is not a conspiracy case, but a case concerning solicitation of murder.

The *Davis* case rejected "the notion that the number of solicitations shown by the evidence is a question of fact for the trier of fact," and adopted the theory that there are necessarily as many solicitations as there are potential victims. *(Davis, supra,* 211 Cal.App.3d at pp. 322–323.) The *Davis* court reasoned: "The commission of several murders results in more harm than the commission of a single murder. Thus, solicitation to commit several murders is a more serious wrong than solicitation to commit a single murder, no matter to what extent the solicitation constitutes a package deal for the accomplishment of a single purpose. We believe the law to be that the prosecutor may charge and, upon proper findings of guilt, the trial court may convict on, as many counts of solicitation to murder as there are identifiable victims." *(Id.* at p. 323.)

The problem with reflexively extending *Davis, supra,* 211 Cal.App.3d 317, to all conspiracies is that the number of victims is not a firm basis or indicator for determining the number of conspiracies. It is the agreement, not the overt acts, that defines the crime. *(Braverman v. United States, supra,* 317 U.S. at p. 53.) Of course, solicitation to murder is also not defined by the number of victims, but by the number of solicitations, or " 'incitements.' " *(People v. Cook* (1984) 151 Cal.App.3d 1142, 1146 [199 Cal.Rptr. 269].)

Unlike conspiracy, however, a multiplicity of victims in solicitation to murder cases often reveals a multiplicity of objectives. (*Ibid.*) Where a solicitee is importuned to commit separate acts of murder, there are multiple solicitations. (*Ibid.*) But a coconspirator importuned to commit separate criminal acts is not necessarily engaged in multiple conspiracies; a single conspiracy may have as its object one or many crimes. (*Braverman, supra,* at p. 53.) We do not believe that *Davis,* which held that the number of solicitations to murder is not a question of fact for the jury, is properly extended to hold that the number of conspiracies is never a question of fact for the jury.

Accordingly, we follow *Jasso* in holding that a trial court is required to instruct the jury to determine whether a single conspiracy or multiple conspiracies exist when there is evidence to support alternative findings. (*Jasso, supra,* 142 Cal.App.4th at p. 1220.) However, we conclude that the evidence here did not support alternative findings.

2. *The evidence does not support a finding that there was one overall conspiracy*

Defendant maintains that the evidence at trial supported an alternative finding that a single conspiracy existed, rather than multiple conspiracies as alleged. Defendant argues that the evidence shows just one overall insurance fraud conspiracy with all coconspirators working as a group in various functions. The argument is unsupported by the record.

The evidence is that defendant operated independently as a sole proprietor who obtained "leads" (separately stolen police reports), used those leads to contact injured insureds, referred insureds to a number of different lawyers and chiropractors, and then encouraged the insureds to file false insurance claims with various insurers. The only common element is each conspiracy was defendant himself, who formed separate confederations with various parties at different times for different transactions. The evidence does not support a finding of a single enterprise with a common purpose.

The facts of this case are analogous to *Kotteakos v. United States* (1946) 328 U.S. 750, 752–753 [90 L.Ed. 1557, 66 S.Ct. 1239], where the defendant acted as a broker assisting several individuals in filing false loan applications. Finding no connection between the borrowers, the United States Supreme Court observed that the case presented several conspiracies patterned like a wheel with separate spokes meeting at a common center (the defendant) without a rim enclosing the spokes. (*Id.* at pp. 754–755.) While the loan applications were all linked to the defendant and had a similar purpose, it was

not possible for the jury to conclude that the defendant and the borrowers "were in a common adventure." (*Id.* at pp. 768–769.) The court warned against confusing "the common purpose of a single enterprise with the several, though similar, purposes of numerous separate adventures of like character." (*Id.* at p. 769.)

■ "Where two or more persons agree to commit a number of criminal acts, the test of whether a single conspiracy has been formed is whether the acts 'were tied together as stages in the formation of a larger all-inclusive combination, all directed to achieving a single unlawful end or result.' " (*People v. Morocco, supra*, 191 Cal.App.3d at p. 1453.) "Relevant factors to consider in determining this issue include whether the crimes involved the same motives, were to occur in the same time and place and by the same means," and targeted a single or multiple victims. (*McLead, supra*, 225 Cal.App.3d at p. 920.)

The conspiracies here were distinct and disconnected, not part of a larger all-inclusive combination directed to a single unlawful end. The nine conspiracies involved different combinations of conspirators and different time periods, and targeted different insurers. While defendant and the police clerk Esquivel were common conspirators in the theft of a police report in each count, most of those counts included additional conspirators and additional target crimes. Only two counts involved defendant and Esquivel as the sole named conspirators whose objective was the theft of police reports (counts 20, 28). But even those crimes occurred at different times and involved different reports and different injured parties. Moreover, there was no evidence that the conspiracy between defendant and Esquivel for the theft of police reports rested upon a single, uninterrupted agreement. Esquivel testified that she did *not* continuously provide accident reports to Lim from 1997 to 1999 (and, through him, to defendant). Esquivel said: "Sometimes I would stop [providing reports], then I would continue and then I would stop." The evidence would not have supported a finding of a single conspiracy. The trial court therefore was not required to instruct the jury to determine whether single or multiple conspiracies existed.

C.–F.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 1648.

## DISPOSITION

The judgment is affirmed.

Ruvolo, P. J., and Reardon, J., concurred.

A petition for a rehearing was denied September 11, 2008, and appellant's petition for review by the Supreme Court was denied December 10, 2008, S167122.