Filed 4/1/14  P. v. Salazar CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B248549 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA123375) |
| v. | |
| NOE FAVELA SALAZAR, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Arthur Lew, Judge.  Affirmed and remanded.

Jean Ballantine, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, and Robert C. Schneider, Deputy Attorney General, for Plaintiff and Respondent.

_____

The jury convicted defendant and appellant Noe Favela Salazar in count 1 of attempted murder (Pen. Code, §§ 664, 187, subd. (a))[1] and in counts 2 and 3 of conspiracy to dissuade a witness (§§ 182, subd. (a)(1), 136.1). The jury also found true the allegation that the offenses were committed for the benefit of, at the direction of, and in association with a criminal street gang as to all three counts (§ 186.22, subd. (b)(4)).[2]

The trial court sentenced defendant to three consecutive terms of 15 years to life, for a total of 45 years to life.

Defendant contends that: (1) there is insufficient evidence to support the verdicts on two separate counts of conspiracy; (2) the trial court erred in failing to sua sponte instruct the jury to decide whether there were two separate conspiracies or one overall conspiracy or alternately that counsel was ineffective for failing to request such instruction; (3) there is insufficient evidence to support the gang enhancements; and (4) the life sentences on the conspiracy counts are unauthorized.

The Attorney General disputes the substantive contentions but agrees the conspiracy sentences are unauthorized.

We vacate the sentences on the conspiracy convictions in counts 2 and 3 and remand to the trial court for resentencing on these counts. In all other respects, the judgment is affirmed.

---

[1]     All further statutory references are to the Penal Code unless otherwise noted.

[2]     The case was originally filed against defendant and seven others in a five-count complaint. The case was subsequently refiled against defendant, alleging one count of attempted murder and two counts of conspiracy. The other original defendants are not parties to this appeal.

# FACTS

## Attempted Murder of Andres Perez

On the afternoon of June 5, 2011, Perez was walking down the street in the City of Paramount, within territory claimed by the Compton Varrio Segundo gang (CVS). Perez had "Krooks Town" tagging crew tattoos visible on his arms. Four males in a black car pulled alongside him. The passenger in the front seat asked Perez where he was from and what his tattoos said. Perez told him, "Krooks Town," and continued to walk home. Once home, Perez grabbed a basketball and headed to the park. The black car pulled up next to him again, and the men asked Perez where he was from a second time. The men identified themselves as members of CVS and said, "Fuck San Streets." Defendant, who was the driver of the vehicle, ordered the back seat passengers to get out. One of the men exited the vehicle. Perez turned and tried to run home, but the man grabbed him by the shirt, pulled him back to the car, and attempted to stab him in the neck. Perez resisted. As the two were struggling, Perez heard one of the men say, "Get out of the car." He heard the car door slam, and a second man got out and stabbed him in the side. One of the men said, "I hope you die." Perez managed to break free and run home.

Perez made it to the front gate of the house where he was staying with his girlfriend, Reyna, and her family. Reyna had cousins who were gang members, including one with the moniker "Scandalous," who was a member of Compton Varrio Largo. Reyna and another man helped Perez into the house. Perez told them CVS members had stabbed him. He was hospitalized for his injuries.

Perez identified defendant as the driver, and also identified the man who attempted to stab him in the neck, and the man who stabbed him in the side. Perez relocated a few weeks after the incident, because he feared his girlfriend's family would suffer retribution if he continued to live with them.

**Attempted Murder of Raul Magallanes**

On the evening of June 12, 2011, Magallanes was walking in the City of Paramount in an area occupied by both the San Streets and CVS gangs. Magallanes associated with members of San Streets and was a member of the "Compton 155" gang. He did not get along with CVS or associate with its members. Magallanes was approached by a black car. He could see two men in the front seat and could tell there were passengers in the back seat. Magallanes saw a man get out of the back seat wielding a gun, so he ran. As he was running, he heard gunshots, and turned to see a man shooting at him. Magallanes jumped over a wall and went into his backyard to evade the shooter. The man with the gun ran past him. Magallanes's sister Olivia was outside at the time of the shooting and witnessed the incident. She saw the face of the man in the car's front passenger seat and also saw the man with the gun, who ran right past her in pursuit of Magallanes.

Defendant and the suspects involved in the shooting had previously harassed Magallanes. The garage wall at his family home had been tagged with CVS gang graffiti and anti-Compton 155 and anti-San Streets graffiti prior to the shooting incident. Magallanes had not reported the shooting for fear of the consequences.

Someone reported the shooting, however, and Magallanes and his sister were taken to a field showup with officers later that night. Magallanes identified the vehicle and the four men involved in the incident. Olivia separately identified the shooter. Defendant was not implicated in the shooting.

**Conspiracies to Dissuade Perez and Magallanes**

Detective Kasey Woodruff was the investigating officer assigned to the stabbing incident involving Perez. When he learned of the shooting incident involving Magallanes, he began working with Detective Liliana Jara, who was assigned to that

4

case. Detective Woodruff listened to defendant's jailhouse telephone calls soon after he was arrested. The calls were played for the jury at trial.

In a July 3 telephone call, defendant's girlfriend Emma Melchor asked him if she would see "the people who are accusing you" when she went to court. Defendant responded yes, and Melchor responded, "Okay, then, so I will know who it – what's going to happen."

In a July 5 call between defendant, Melchor, and defendant's brother Jaime, Jaime told defendant not to worry because he had "action." Defendant asked Jaime if he remembered Andres and said, "he's someone who supposedly . . . he's on the case." Melchor told defendant to get the police report. She also said: "didn't your brother tell you that you have action? That's all you need to know."

In a July 7 call, Melchor told defendant, "we read the police report. . . . I guess it's some fool Andres and some fool Raul . . . ."

In a July 14 call, Melchor told defendant she had seen Detective Woodruff "with some fool in the morning." She said, "first the guy said that he didn't know who was who, and now he's sayin' that you're the driver" and "supposedly the fool that's sayin' that is Andres Perez." Defendant asked Melchor to make a three-way call with his brother Gabriel. When Gabriel got on the line, defendant confided, "it's going really bad for me Homie." Defendant referred to the "KT's" that were fighting with ones from "S" and asked if Gabriel remembered that "some foo's from the 'S' . . . had stabbed . . . the one from Krooks Town." Defendant pleaded with Gabriel to "talk to him, homie. Talk to him Dawg. It's him. Please." Gabriel said he would "get a hold of them." Gabriel later told Detective Jara that he agreed to go and speak to the victims.

In a July 16 call, Melchor said she had good news for defendant, and that his brother "had a good talk with one of them." Gabriel said that one of them had a cousin who was also in county jail. Defendant told Gabriel to get the cousin's booking number so that defendant could get his name. Defendant said, "the finger, his name is Andres." Melchor responded, "There are two of them." Defendant agreed and added the "other one is from one, five, five" and that his name was Raul.

5

In an August 5 call, defendant asked Melchor if she thought the victim was going to show up. Melchor responded, "I know, hopefully not, we just have to keep faith and keep on prayin' . . . but supposely [*sic*] . . . Gabriel . . . already took care of all that, everything is going to be alright."

In an August 16, 2011 call, Melchor told defendant that his brother had talked to "those cousins" and "they aren't going to that party, like at all. He had a good talk with them." Defendant asked if Jaime or Diego had talked with "the scandalous one." Melchor said that the cousin and his friend had been talked to, and "they aren't going to that party."

Gang expert Raul Enriquez listened to jailhouse calls and opined on the meaning of the "gang code" used. He testified that "You have action" meant the witnesses had been talked to and had agreed not to appear in court. "Talk to him, Dawg" meant defendant wanted his brother to dissuade the witness. Melchor's statement that defendant's brother "already had a talk with one of them" meant that Gabriel confronted the witness. References to the cousin in county jail and "the scandalous one" were to a gang member from Compton Varrio Largo. Melchor's statement that the cousins were "not going to the party" meant that the witnesses would not appear in court.

In July and August of 2011, Joshua Garcia, a CVS shot caller known as "Sniper," went to Magallanes's house several times. The first time, he parked in the driveway and Magallanes ignored him. The second time, Garcia knocked on Magallanes's door, but Magallanes did not answer because he knew it was "not going to be good." Magallanes had not testified yet and was concerned Garcia would ask him questions. On a third occasion, Magallanes was at his neighbor's garage with his father when Garcia came up the neighbor's driveway. Magallanes's father told him to stay inside. The fourth time, Garcia approached Magallanes near his house. He asked Magallanes if he knew anything about the shooting and who had talked to the police. Magallanes answered that his neighbors may have talked to police. Garcia wanted to know what was happening, "so nobody goes to court." He said to Magallanes, "Just tell them we'll shoot them some

6

money or whatever. We'll try to get them something. Just tell them not to go to court or whatever."

Olivia Magallanes was also approached after the shooting. At a court appearance in August 2011, Olivia told Detective Woodruff she feared for her safety because Garcia had come looking for her. A month before Olivia testified at the initial trial, two CVS gang members called her name and said, "Segundos," when she was at a Circle K store.

## DISCUSSION

### *Substantial Evidence Supports the Two Conspiracy Convictions*

"In reviewing a challenge to the sufficiency of the evidence under the due process clause of the Fourteenth Amendment to the United States Constitution and/or the due process clause of article I, section 15 of the California Constitution, we review the entire record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People v. Cole* (2004) 33 Cal.4th 1158, 1212.) "'"[I]f the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder."' [Citation.]" (*People v. Snow* (2003) 30 Cal.4th 43, 66.)

We reject defendant's contention that the evidence was insufficient to establish two separate conspiracies rather than a single, overarching conspiracy. "The necessary elements of a criminal conspiracy are: (1) an agreement between two or more persons; (2) with the specific intent to agree to commit a public offense; (3) with the further specific intent to commit that offense; and (4) an overt act committed by one or more of the parties for the purpose of accomplishing the object of the agreement or conspiracy." (*People v. Liu* (1996) 46 Cal.App.4th 1119, 1128.) "[T]he essence of the crime of conspiracy is the agreement, and thus it is the number of the agreements (not the number

7

of the victims or number of statutes violated) that determine the number of the conspiracies. . . . 'The gist of the crime of conspiracy . . . is the agreement or confederation of the conspirators to commit one or more unlawful acts . . . .' [Citation.]" (*People v. Meneses* (2008) 165 Cal.App.4th 1648, 1669-1670 (*Meneses*).) "'Performance of separate crimes or separate acts in furtherance of a conspiracy is not inconsistent with a "single overall agreement." [Citation.] . . .' [Citation.]" (*People v. Vargas* (2001) 91 Cal.App.4th 506, 553-554.) "'Where two or more persons agree to commit a number of criminal acts, the test of whether a single conspiracy has been formed is whether the acts "were tied together as stages in the formation of a larger all-inclusive combination, all directed to achieving a single unlawful end or result."' [Citation.] 'Relevant factors to consider in determining this issue include whether the crimes involved the same motives, were to occur in the same time and place and by the same means,' and targeted a single or multiple victims. [Citation.]" (*Meneses*, *supra*, at p. 1672.)

Substantial evidence supports the two separate conspiracy convictions in this case. Defendant was a perpetrator in the incident involving Perez but not implicated or charged with the crime against Magallanes. His motivations for dissuading the witnesses were vastly different as a result of the disparity in his involvement in the two crimes. In Perez's case, defendant himself faced a charge of attempted murder. Defendant's chances of avoiding conviction would have improved had Perez been intimidated or dissuaded against testifying. In contrast, defendant had no personal stake in Magallanes's case—his only motivation to dissuade Magallanes was to protect fellow gang members from conviction. Significantly, neither the underlying crimes nor the victims were connected, apart from the crimes having some perpetrators in common. The victims did not know each other, they belonged to different gangs, and they were attacked in different places and by different means, several days apart. Additionally, different individuals attempted to dissuade Perez and Magallanes, at different times and locations. Gabriel spoke to Perez, whereas it was Garcia who approached Magallanes. Garcia attempted to contact Magallanes on several occasions and told him the gang would pay money to prevent the case from going to court. Gabriel attempted to dissuade Perez by putting

pressure on "the cousins" who had influence over him. All the factors to be considered support the conclusion that there were two conspiracies rather than one: there were separate motives, multiple victims were involved, and the dissuasion was to occur by different means in different times and places. Both conspiracy convictions are supported by substantial evidence in the record.

### *The Trial Court Had No Duty to Instruct on Single Versus Multiple Conspiracies*

Generally, "'[a] trial court has a duty to instruct the jury "sua sponte on general principles which are closely and openly connected with the facts before the court." [Citation.] . . . [Citation.]'" (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824.) As the parties concede; however, there is a split of authority as to whether there is a duty to instruct with respect to whether a defendant's actions constitute a single conspiracy or multiple conspiracies. (*Meneses*, *supra*, 165 Cal.App.4th at p. 1668 ["California intermediate appellate courts are presently divided on whether the trial court has a duty to instruct the jury on single versus multiple conspiracies."].) Importantly, courts that have held a duty exists have concluded the trial court is only bound to instruct the jury where there is evidence to support alternate findings. (*Id*. at p. 1671; *People v. Jasso* (2006) 142 Cal.App.4th 1213, 1220.) Consequently, under these facts, we need not resolve the issue of whether there is a duty to instruct in the abstract. Regardless of whether the duty exists, the evidence does not support an alternate finding that there was a single overarching conspiracy, thus no instruction was necessary. (See *Meneses*, *supra*, at pp. 1668-1672 [holding no duty to instruct where there is no evidence to support alternate findings].)

As discussed above, the evidence, as a matter of law, supports the finding that there were two distinct conspiracies. The only commonalities are that some members of the same gang were involved in the underlying crimes, and that defendant planned both conspiracies in conversations with Melchor, Jaime, and Gabriel. These common factors make no difference to our ultimate conclusion.

9

First, we agree with the Attorney General that the fact that the underlying crimes were committed by members of the same gang is not helpful to defendant, because the category of "dissuading victims of crimes committed by the same gang"—or even committed by some of the same gang members—is simply too broad to define a single conspiracy. The acts were not """"tied together as stages in the formation of a larger all-inclusive combination, all directed to achieving a single unlawful end or result.""" (See *Meneses*, *supra*, 165 Cal.App.4th at p. 1672, citing *People v. Morocco* (1987) 191 Cal.App.3d 1449, 1453.) Neither conspiracy to dissuade was a means of achieving the other. Dissuading Perez would have benefitted defendant, whereas dissuading Magallanes would have benefitted other gang members. Dissuasion of Perez would have no effect in defendant's case and dissuasion of Magallanes would have no effect on defendant's fellow gang members' case.

Second, it is irrelevant that defendant's conversations with Melchor, Jaime, and Gabriel set both conspiracies in motion. It would be more risky for defendant to contact different sets of people to carry out the separate acts, thus increasing the chances of having the conspiracies uncovered. Defendant determined Melchor and his brothers were best-suited to ensure the witnesses did not testify and enlisted their help to orchestrate both crimes. Because nothing in the record supports a finding of multiple conspiracies, we hold the trial court did not have a duty to instruct in this instance. (See *Meneses*, *supra*, 165 Cal.App.4th at pp. 1668-1672.)

### *Counsel Did Not Render Ineffective Assistance*

Defendant's ineffective assistance of counsel contention fails for the same reasons. "To secure reversal of a conviction upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would

10

have obtained a more favorable result absent counsel's shortcomings." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003 (*Cunningham*), citing *Strickland v. Washington* (1984) 466 U.S. 668, 687-694 (*Strickland*); *Williams v. Taylor* (2000) 529 U.S. 362, 391-394; *People v. Kraft* (2000) 23 Cal.4th 978, 1068 (*Kraft*).) "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' ([*Strickland*, *supra*, at p. 694]; *People v. Riel* (2000) 22 Cal.4th 1153, 1175.)" (*Cunningham*, *supra*, at p. 1003.) Here, there was no evidence of a single conspiracy, so counsel was not remiss in failing to request an instruction, nor was the outcome of the trial adversely affected by the absence of an instruction.

### *Substantial Evidence Supports the Gang Enhancements*

Defendant also challenges the sufficiency of the evidence supporting the jury's finding that the charged offenses were committed "for the benefit of, at the direction of, or in association with [a] criminal street gang" within the meaning of section 186.22, subdivision (b)(1), of the California Street Terrorism Enforcement and Prevention Act (STEP Act) (§ 186.20 et seq.).

"[T]o subject a defendant to the penal consequences of the STEP Act . . . , the prosecution must prove that the gang (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute; and (3) includes members who either individually or collectively have engaged in a 'pattern of criminal gang activity' by committing, attempting to commit, or soliciting *two or more* of the enumerated offenses (the so-called 'predicate offenses') during the statutorily defined period. (§ 186.22, subds. (e) and (f).)" (*People v. Gardeley* (1996) 14 Cal.4th 605, 616-617 (*Gardeley*).) Defendant contends that in his case, the prosecution's expert witness's opinion that CVS's primary activities involved assaults,

11

attempted murders, threatening gang graffiti, witness intimidation, and drug sales lacked adequate foundation.[3]  We disagree.

"The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations.  [Citation.]  That definition . . . necessarily exclude[s] the occasional commission of those crimes by the group's members."  (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.)  The trier of fact may look to both the past and present activities of the gang for the statutorily enumerated crimes to establish a gang's primary activities.  (*Ibid.*)  "Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute."  (*Id.* at p. 324.)  Expert testimony may serve as such evidence, where it is based on reliable information.  (*Ibid.*)  A gang expert may base his or her opinion regarding a gang's primary activities on conversations with gang members, his or her personal investigation of crimes committed by gang members, and information provided by his or her colleagues.  (*Gardeley, supra,* 14 Cal.4th at p. 620.)

In this case, the prosecution called Detective Jara to testify as an expert on the CVS street gang, of which defendant was a member.  Detective Jara had extensive knowledge of the gang.  She grew up in Compton and was personally aware of the gang from the age of 12, she served as a peace officer in the Los Angeles County Sheriff's Department for 8 years, and she was assigned to the Operation Safe Streets Bureau, which specifically targeted CVS—and where she personally investigated over 50 gang-related crimes—in June of 2011.  Prior to joining Operation Safe Streets, Detective Jara participated in numerous hours of training on gang culture over a span of years.  She had previously been assigned to the Los Angeles County Jail where she "spoke to [gang members] . . . about the gang culture, their personal experiences in the gang life, and the crimes they committed for the gang."  She had also been assigned to patrol where she

---

[3]     All of these crimes are qualifying primary activities included in section 186.22, subdivision (e).

12

"contacted numerous gang members who were being investigated for crimes being committed by them. . . . " At the time of the trial, Detective Jara was a member of the California Gang Investigators Association, which provides its members with weekly updates on new gang trends and culture. She testified that she "continuously [spoke] with other gang investigators in regards to gangs in the area and new gang trends" as well.

On direct examination, Detective Jara was questioned as to the primary activities of CVS:

"[Prosecutor]: And so can you tell us what are primary activities -- well, let me ask you this question: Have you heard of primary activities?

"[Detective Jara]: Yes.

"[Prosecutor]: What does that mean to you?

"[Detective Jara]: Primary activities are criminal activities that the gang is involved in.

"[Prosecutor]: Now, can you tell us what are some of the primary activities of Compton Varrio Segundo?

"[Detective Jara]: Yes.

"[Prosecutor]: The primary activities for?

"[Detective Jara]: The primary activities for Compton Varrio Segundo are assaults, attempt [sic] murders, threatening gang graffiti, witness intimidation, and drug sales."

Defendant takes issue with the fact that Detective Jara did not use the word "primary" when defining "primary activities" in questioning. We do not believe that the correct definition of the term requires the use of a specific word.

Detective Jara's answer indicated that CVS's participation in the enumerated crimes was more than "occasional"—the gang was "involved" in the activities she listed. Additionally, Detective Jara was later asked if CVS "was currently active, meaning that they are currently committing criminal activity?" She responded yes and was then asked if this was "on occasion," and she responded that the gang was active "on a day-to-day

13

basis." Detective Jara further testified that she was aware of ten assaults, shootings, and attempted murders involving CVS in 2011, two of which she investigated personally.

Defendant also argues that Detective Jara provided insufficient information to establish that the basis for her opinion was reliable. Defendant analogizes his case to *In re Alexander L.* (2007) 149 Cal.App.4th 605 (*Alexander L.*), where the expert witness testified that gang members were primarily involved in assault with a deadly weapon, murder, and narcotics violations. (*Id*. at p. 611.) Specifically, "[w]hen asked about the primary activities of the gang, he replied: 'I know they've committed quite a few assaults with a deadly weapon, several assaults. I know they've been involved in murders. [¶] I know they've been involved with auto thefts, auto/vehicle burglaries, felony graffiti, narcotic violations.' No further questions were asked about the gang's primary activities on direct or redirect examination." (*Ibid*.)

The *Alexander L.* court concluded there was insufficient evidence to support the gang enhancement, reasoning: "[the expert's] entire testimony on this point is quoted above—he 'kn[e]w' that the gang had been involved in certain crimes. No specifics were elicited as to the circumstances of these crimes, or where, when, or how [the expert] had obtained the information. He did not directly testify that criminal activities constituted [the gang]'s primary activities. Indeed, on cross-examination, [the expert] testified that the vast majority of cases connected to [the gang] that he had run across were graffiti related. [¶] Even if we could reasonably infer that [the expert] meant that the primary activities of the gang were the crimes to which he referred . . . [¶] [w]e cannot know whether the basis of [the expert's] testimony on this point was reliable, because information establishing reliability was never elicited from him at trial." (*Alexander L.*, *supra*, 149 Cal.App.4th at p. 611, fn. omitted.)

This case is readily distinguished from *Alexander L.* Detective Jara directly testified that assaults, attempted murders, threatening gang graffiti, witness intimidation, and drug sales were the gang's primary activities. She knew this because she had long observed the gang, and because her unit had investigated ten assault/shootings/attempted murders in 2011 alone. She investigated two of those incidents herself, and the others

were investigated by colleagues with whom she conversed regularly regarding the activities of the local gangs. She did not equivocate or contradict herself on cross-examination.

Viewing the evidence in the light most favorable to the judgment, the evidence supports the jury's verdict that CVS is a criminal street gang with its primary activities being the commission of offenses enumerated in the STEP Act. Reversal is not warranted "unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) That is not the case here. We affirm the judgment against defendant on the charge of active participation in a criminal street gang.

### *The Life Sentences on the Conspiracy Counts Were Unauthorized*

We agree with the parties that the trial court's imposition of 15 years to life on counts 2 and 3 were unauthorized, and that the case must be remanded for resentencing on these counts. Defendant was convicted of two counts of conspiracy to dissuade a witness in violation of section 182, subdivision (a)(1), with enhanced terms pursuant to section 186.22, subdivision (b)(4). It was not alleged that defendant used threats or violence toward either victim in the course of these crimes, the jury was not asked to determine whether threats or violence were used in their commission, and neither the use of threats nor violence was proven at trial. At the sentencing hearing, the prosecution argued that a 15 years-to-life sentence was appropriate, and the trial court imposed the sentence according to the prosecution's recommendation. Defense counsel objected, arguing that 7 years-to-life was the correct term. Neither the sentence imposed nor the sentence urged by trial counsel for defendant was appropriate in this case.

First, under section 186.22, subdivision (b)(5), a life sentence with a 15-year minimum parole date is imposed only where the underlying crime is punishable by life in prison. That was not the case here, as the underlying crime of conspiracy to dissuade a witness does not carry a term of 15 years to life under any circumstances. (See § 136.1.)

15

Second, section 186.22, subdivision (b)(4)(C) provides that a 7 years-to-life sentence may be imposed only if the jury convicts a defendant of making either an implied or express threat of force to a victim or witness, as defined in section 136.1, subdivision (c)(1). (*People v. Anaya* (2013) 221 Cal.App.4th 252, 269-271; *People v. Lopez* (2012) 208 Cal.App.4th 1049, 1065.) As we discussed above, the jury made no finding with respect to threat or violence.

Accordingly, we vacate the sentences on counts 2 and 3 and remand to the trial court for resentencing on both counts.

## DISPOSITION

The cause is remanded to the trial court for resentencing on counts 2 and 3 (conspiracy in violation of § 182, subd. (a)(1)). In all other respects, the judgment is affirmed.

KRIEGLER, J.

We concur:

TURNER, P. J.

MOSK, J.