Filed 2/23/15  P. v. Madrid CA5

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RAUL ZARCO MADRID,<br><br>Defendant and Appellant. | F067647<br><br>(Super. Ct. No. VCF266370B)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Harry N. Papadakis[*] and Gary L. Paden, Judges.[†]

Gabriel C. Vivas, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Stephen G. Herndon, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Retired Judge of the Fresno Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution

[†]     Judge Papadakis presided over defendant's trial; Judge Paden sentenced defendant.

A jury found defendant Raul Zarco Madrid guilty of cultivating marijuana (Health & Saf. Code,[1] § 11358) and possessing marijuana for sale (§ 11359). In this appeal, Madrid contends there was insufficient evidence to support his convictions and the trial court erred in refusing to give a jury instruction on mistake of fact.

We affirm.

## *FACTS AND PROCEDURAL HISTORY*

On April 6, 2012, Detective Hector Rodriguez and two other detectives from the Tulare County Sheriff's Department visited a property on Road 104 in a rural area of the county to investigate a suspected illegal marijuana growing site. (The previous day, Rodriguez had driven by the property and contacted two individuals there.) On the north end of the property was a single-story house. On the south end of the property, there were three separate enclosures. The three enclosures were constructed of sheet metal and wooden fencing.

The northernmost enclosure contained a shed or shop, a horse trailer, a fifth wheel trailer, and a couple of vehicles. The fence of the northern enclosure varied in height from six to eight feet tall, except for a portion on the north side at the northwest corner, which was cut low to about three or four feet. From the northwest corner of the northern enclosure, Rodriguez had a clear view of everything inside. He saw Madrid walk from the shed toward the north fence of the northern enclosure and then duck down quickly. Rodriguez called Madrid over, Madrid complied, and he was detained and handcuffed. Madrid was limping and his right foot was swollen. He told Rodriguez he was in the process of putting up boards on his fence and he dropped one of the boards on his foot. No one else was found inside the northern enclosure.

Rodriguez read Madrid his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 and interviewed him in Spanish. He asked Madrid if he lived there, and Madrid stated

---

[1] All further statutory references are to the Health and Safety Code unless otherwise noted.

2.

that he had been living in the fifth wheel trailer[2] for five weeks. Rodriguez observed marijuana growing in an area near the trailer and extending across the south side of the northern enclosure. There were 271 marijuana plants growing in the enclosure. The plants varied in size; most were between two and three inches tall, but a few were about two feet tall. There were no barriers, strings, or other dividers separating the marijuana growing area into different sections. The plants appeared to have been watered recently as the dirt was still wet. There was a water hose in the grow area connected to a spigot next to the trailer. In addition to the 271 living plants, there were eight to 10 uprooted marijuana plants, about two to three feet tall, which were lying on a small table or stool on the south side of the trailer.

Madrid only claimed ownership of the plants growing in 24 planting holes extending from just south of his trailer to a wooden post about 40 feet south of the trailer. A doctor's recommendation for Madrid was stapled or nailed to the wooden post. Madrid said he had planted about two to three seeds per hole. Within the smaller area of marijuana plants Madrid claimed as his, Rodriguez counted 68 plants. Madrid told Rodriguez he did not know who the other plants belonged to. He had seen four or five people come to the northern enclosure to tend the plants, but he did not know who they were. Rodriguez found another doctor's recommendation for Mario Gomez posted in the middle of the growing area.

Madrid told Rodriguez that he pulled a tendon in his arm and the marijuana helped him with the pain. He smoked marijuana and used it in teas and rubs.[3] Rodriguez asked how much he smoked, and Madrid replied about two or three cigarettes per day. Madrid

---

[2]    Hereafter, references to a trailer are to the fifth wheel trailer where Madrid lived (not the horse trailer also located inside the northern enclosure).

[3]    Rodriguez testified he was familiar with marijuana rubs, which are made by soaking the plant in alcohol. The mixture is said to relieve pain.

also told Rodriguez he was paying rent to his cousin Tomas and Tomas had given him permission to plant his marijuana at the property.

Rodriguez asked Madrid if he had grown marijuana before, and Madrid responded that this was his first year growing. Rodriguez asked how he obtained marijuana before he started growing for himself, and Madrid said that a friend had given him two marijuana plants and that was how he obtained marijuana the previous year. Rodriguez asked why he planted so much. Madrid answered that his doctor's recommendation allowed it.

Rodriguez asked Madrid hypothetically if his plants produced 20 pounds of marijuana and he was only allowed to possess six pounds, what he was planning to do with the rest. Madrid said he had been told by a friend that he could take it up to a store and sell it. Rodriguez attempted to clarify this response, and Madrid agreed that he meant he would sell any excess marijuana to a clinic.

Rodriguez briefly searched the trailer and did not notice any items indicating marijuana use. He did not find any rubbing alcohol, tea kettle, rolling papers, smoking pipes, or lighters. He did locate partially processed marijuana in two plastic bags.[4] The marijuana and the two plastic bags weighed 94 grams. Madrid told Rodriguez these bags of marijuana were not his and they belonged to a friend who had left them there. Rodriguez patted Madrid down and did not find any marijuana cigarettes or rolling papers on his person.

On December 28, 2012, the Tulare County District Attorney filed an information charging Madrid with unlawfully planting, cultivating, harvesting, drying, and processing marijuana (§11358; count 1) and unlawfully possessing marijuana for the purpose of sale (§ 11359; count 2).

---

[4]     Rodriguez explained that the plants had been dried but not "manicured," meaning the leaves had not yet been cut to expose the buds for harvesting.

A jury trial began on June 10, 2013. Rodriguez and Madrid were the only witnesses.

Rodriguez regularly contacts growers, users, and sellers of marijuana in the course of his duties with the sheriff's department, and he testified as an expert in marijuana investigations. He explained that cultivators of marijuana typically plant four or five seeds per hole because they do not know which plants will be male or female. After the plants sprout and the growers can determine the sex of the plants, they pull out the male plants because only the female plants produce flowers or buds, which are the part of the plant with the highest tetrahydrocannabinol (THC) content. Rodriguez noted that a male plant can be used to make alcohol rubs, but it does not produce marijuana for smoking. Typically, the optimum time to plant for an outdoor marijuana growing operation is late March or early April. The size of the plants (seedlings) found in the northern enclosure was consistent with an optimum planting cycle. The production or yield of marijuana plants varies, but a conservative estimate of average yield is one pound of usable marijuana per plant.

Rodriguez took Madrid's statement that he smoked two or three cigarettes per day and estimated Madrid's potential yearly use. As a high estimate, if he smoked three cigarettes per day that weighed two grams each, Rodriguez calculated Madrid would smoke about 4.8 pounds of marijuana per year. If, on the other hand, he smoked two cigarettes per day at one gram each, he would smoke 1.6 pounds of marijuana per year.

Part of a marijuana investigation involves determining whether the marijuana is being grown for sale or for personal medical use with a valid doctor's recommendation. One of the factors Rodriguez considers in making this determination is the amount being grown. In his experience, he has seen many people who obtain a recommendation to grow marijuana for medical use but then admit that they plan to sell the marijuana. It is also common in his experience to see people duplicate or modify a doctor's recommendation, so they can grow more than the doctor actually recommended. For

5.

example, a single recommendation may be posted at different growing sites. While the price varies depending on quality, a pound of marijuana has an average street value in Tulare County of about $1,000.

Given the hypothetical that a person ducks when sheriff's detectives arrive at a site where 271 marijuana plants are growing in an enclosure, the person reports he has lived in a trailer in the enclosure for five weeks and he uses about five pounds of marijuana per year for his own medical needs but there is no evidence of marijuana use on his person or in his trailer, and the person claims ownership of 68 marijuana plants but states he used marijuana from two plants the previous year, Rodriguez offered his opinion that the person in the hypothetical would be in possession of marijuana for sales.

On cross-examination, Rodriguez testified there were no two-foot-tall marijuana plants within the area of plants claimed by Madrid. He did not ask Madrid how many times a day Madrid used marijuana teas and rubs, and his estimate of Madrid's yearly marijuana needs did not include marijuana used in teas or rubs. Rodriguez agreed that Madrid was cooperative throughout the interview and he gave the detectives permission to search his trailer. He did not recall meeting Madrid at the property the day before the arrest.

Madrid testified on his own behalf using a Spanish language interpreter. He does not read or write in Spanish. He testified that he obtained a medical marijuana recommendation on March 12, 2012. He would smoke marijuana or "put it into alcohol" (apparently referring to a tincture or rub), and he also drank it in teas. Madrid was working in Washington and he hurt his hands. He injured his shoulder, and he also had arthritis in his hands. He was given medication that was very strong, and then it was taken away because of concern he could become addicted.

A friend told Madrid that marijuana would be good for the pain. He testified that he never used or grew marijuana before he received a prescription for marijuana. However, when asked when he started using marijuana, he answered, "I've been here two

6.

years, and I just spent a year and a half, that's all." When he went to the doctor, he filled out a "compassionate use act questionnaire" with the help of his niece. He testified that, before he received his doctor's recommendation, he only used marijuana with rubbing alcohol. He testified that the doctor told him he could grow 90 plants.

Asked how he found out how to grow marijuana, Madrid responded, "I didn't know how I was going to plant them. I just put the seeds that he gave me, I put them there in the little holes." He testified that his friend gave him 68 seeds. Madrid did not know whether his planting would yield more than he would need for a year. The prosecutor asked why he decided to plant 68 seeds. He explained, "Of those 68, I didn't know which ones were going to produce.… [M]y plants were just this small." Madrid described the friend who gave him seeds as a white person who had a ranch. Madrid worked for him watering his tangerines. This friend also had marijuana plants growing in his house.

Madrid was told that he could buy or sell marijuana "at the store there with the doctor," which was also the place where he "picked up the license from the doctor." He did not know how much marijuana he used in a year and he did not know how much marijuana might be produced by the plants he had.

Madrid recalled seeing Detective Rodriguez twice, the day he was arrested and the day before that. Madrid told him he had 24 planting holes, not 24 plants. He showed him where they were. On the day he was arrested, Madrid injured his foot. He denied ducking down so law enforcement would not see him. He could not walk. He tried to stand up, but he could not because his foot was injured. Madrid intended to build a fence between his 24 holes and the rest of the plants in the enclosure. He also had tomato and pepper plants next to the trailer and next to the 24 holes.

Asked about what he said to Detective Rodriguez about the plants, Madrid testified: "I told him that where I picked it up, I was given a card so that I could buy the

marijuana from the store or that if I had some, I could sell it to them, but I didn't tell him that I was going to sell it to the store."

On cross-examination by the prosecutor, Madrid hesitated to accept that he had grown the marijuana plants. He testified: "I didn't grow anything. I just simply placed the seeds there. They were just this tiny, this small. I didn't grow anything. They just grew, the seeds just grew there." Madrid also said he just watered the plants one time and never watered again and that they just sprouted two or three days earlier. He dug holes the way "the other guys" had. There were other people who had marijuana plants in the area. He testified, "[T]hey brought the plants and put them there and I didn't. I just placed the seeds." Other people would come to water the other plants.

In rebuttal, Rodriguez was called again. He testified that Madrid told him he had planted the seeds within the previous two to three weeks. In his opinion, it would take 10 to 14 days for a planted marijuana seed to grow into a two-inch seedling. He did not observe any indication, such as fence posts or post holes, that a partition or fence was about to be installed to designate Madrid's claimed area of the marijuana plot.

In addition to the witnesses' testimony, evidence of two different purported doctor's recommendations was presented to the jury. There are references in the trial transcript to (1) the People's exhibit No. 16, which was a photograph of the doctor's recommendation Rodriguez found nailed to a wooden post, and (2) defense exhibit No. A, which was a subpoenaed document obtained from a doctor and which Madrid authenticated as a copy of the recommendation he received from a doctor. From the attorneys' closing statements, we gather there was a discrepancy between the doctor's recommendation posted at the grow site and the recommendation subpoenaed from the doctor. The People's exhibit No. 16 apparently depicted a recommendation that Madrid could have up to 90 plants and six pounds of dried bud, but defense exhibit No. A apparently stated that Madrid was allowed 50 plants and five pounds of marijuana. The

8.

exhibits themselves, however, do not appear to be part of the appellate record. No doctor was called to authenticate either of the exhibits.

On June 12, 2013, the case went to the jury, and the jury reached a verdict. Madrid was found guilty of cultivating marijuana (count 1) and possessing marijuana for sale (count 2). On July 18, 2013, the trial court ordered three years' probation and ordered Madrid to serve 180 days in county jail with credit for time served for count 1 and no time for count 2. Fines and penalties of $1,270 were also imposed.

## DISCUSSION

### I.    Sufficiency of evidence

Madrid's first contention is that the evidence was insufficient to sustain his convictions for cultivation and possession of marijuana for sale.

#### A.    Standard of review

In assessing a claim of insufficiency of the evidence, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no

9.

hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

"The same standard governs in cases where the prosecution relies primarily on circumstantial evidence. [Citation.] We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]' [Citation.] 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]' [Citation.] Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal. [Citation.]" (*People v. Zamudio*, *supra*, 43 Cal.4th at pp. 357–358.)

### B.    Applicable law

Section 11358 makes it a crime to plant, cultivate, harvest, dry, or process "any marijuana or any part thereof, except as otherwise provided by law." Section 11359 makes it a crime to possess for sale "any marijuana, except as otherwise provided by law."

At trial, Madrid presented the defense of limited immunity under the Compassionate Use Act of 1996 (§ 11362.5; CUA). (See *People v. Mower* (2002) 28 Cal.4th 457, 470 (*Mower*).) The CUA provides in relevant part: "Section 11357, relating to the possession of marijuana, and Section 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician." (§ 11362.5, subd. (d).) "[W]ithin its scope, section 11362.5[, subdivision ](d) renders possession and cultivation of marijuana noncriminal—that is to say, it renders possession and cultivation of the marijuana noncriminal for a qualified patient or primary caregiver." (*Mower*, *supra*, at

10.

p. 471.)  The CUA "operates … to render noncriminal certain conduct that otherwise would be criminal."  (*Id*. at p. 472.)

In *Mower*, our Supreme Court recognized that a defendant must be able to defend against a charge of possession or cultivation of marijuana on the ground that the laws do not apply because he or she is a qualified patient under the CUA.  (*Mower*, *supra*, 28 Cal.4th at p. 475.)  The burden of proof as to the facts underlying a CUA defense is allocated to the defendant, but the "defendant is required merely to raise a reasonable doubt" as to those facts.  (*Mower*, *supra*, at pp. 477, 481.)  The defendant is not required to prove by a preponderance of the evidence the facts underlying the defense.  (*Id*. at p. 464.)

The Medical Marijuana Program (§ 11362.7 et seq.; MMP), enacted in 2003, further provides that a "qualified patient or a person with an identification card who … processes marijuana for his or her own personal medical use" "shall not be subject, on that sole basis, to criminal liability under Section 11357 [possession of marijuana], 11358 [cultivation of marijuana], 11359 [possession for sale], 11360 [transportation], 11366 [maintaining a place for the sale, giving away, or use of marijuana], 11366.5 [making available premises for the manufacture, storage or distribution of controlled substances], or 11570 [abatement of nuisance created by premises used for manufacture, storage or distribution of controlled substance]."  (§ 11362.765, subds. (a) & (b)(1); *People v. Dowl* (2013) 57 Cal.4th 1079, 1086 (*Dowl*).)

### C.    Analysis

Madrid does not dispute that he was cultivating marijuana when he was arrested.  Instead, he argues the evidence failed to establish beyond a reasonable doubt that he was cultivating or in possession of marijuana beyond his medical needs.  We disagree.

Intent to sell a controlled substance may be established by circumstantial evidence.  (*People v. Harris* (2000) 83 Cal.App.4th 371, 374.)  As Madrid recognizes, an experienced officer may give his or her opinion that a controlled substance was held for

purposes of sale based on the quantity found, packaging, and considerations of the normal use of an individual.  (*Id.* at pp. 374–375.)  An officer may base his or her opinion that a defendant possessed a controlled substance with intent to sell based on the quantity and "lack of drug paraphernalia."  (*People v. Parra* (1999) 70 Cal.App.4th 222, 227.)  An officer's opinion that a defendant possessed marijuana for purposes of sale together with supporting circumstances may be sufficient evidence to support a conviction in spite of the defendant's claim of lawful possession for purposes of medical treatment.  (See *Dowl*, *supra*, 57 Cal.4th at pp.1083, 1089–1092.)

Here, Madrid was found living in a trailer next to a marijuana growing site. Rodriguez gave his opinion that Madrid possessed marijuana for sale based on the totality of circumstances, including the quantity of marijuana plants and lack of drug paraphernalia.  Madrid appeared to be growing 271 plants when, by his own account, two plants had sufficed the previous year.  There was no indication that he personally used marijuana as there was no evidence on his person or in his trailer suggesting that he smoked marijuana or used it in teas or rubs.  The fact that no marijuana cigarettes, rolling papers, pipes, or lighters were found was particularly relevant in light of Madrid's claim that he smoked two or three cigarettes per day.  A doctor's recommendation for Madrid was posted at the site, but it differed from the recommendation the doctor produced when Madrid's records were subpoenaed.  Rodriguez testified that it was common for people to modify a doctor's recommendation in order to grow more marijuana than was actually recommended.  This was sufficient evidence to support the jury's determination that Madrid possessed marijuana for sale notwithstanding his claim that he was growing marijuana for personal medical use.

Madrid argues the particular facts on which Rodriguez's opinion was based were "insufficiently solid to constitute substantial evidence of guilt."  With respect to the quantity of plants found, Madrid argues:  "Cultivating marijuana is not the same as cultivating tomatoes.…  When planting marijuana, the grower does not know if

12.

marijuana will actually be produced. Unless or until the marijuana plant actually produces the flower or buds, all the grower has is a plant that is useless for purposes of consumption or sale. Because most of the plants in this case were immature and had not produced buds, the mere quantity of plants in this instance is inconclusive to determining whether there was [a] sufficient quantity produced over and above [Madrid's] recommendation."

We are not persuaded. Rodriguez explained that growers pull the male plants when they are able to identify the sex of the plants and an average yield of a marijuana plant is about one pound of usable marijuana. Even if we assume two-thirds of the 271 marijuana plants would later be pulled because they are male, that would leave about 90 plants, which conservatively could be expected to produce about 90 pounds of marijuana. This is far greater than the 1.6 to 4.8 pounds of marijuana Rodriguez estimated that Madrid would smoke in a year. And, given that Madrid said he obtained his marijuana the previous year from two plants, it would not have been reasonable for him to think he would need 90 plants for his personal use.[5]

Further, Madrid's argument presumes the jury believed his testimony that he used marijuana for pain, he obtained a valid recommendation from a doctor, he did not know how much marijuana the plants would produce, and he intended to use the planted marijuana himself. The jury, however, could have disbelieved some or all of Madrid's testimony. (See, e.g., *Dowl*, *supra*, 57 Cal.4th at p. 1092.) Rodriguez testified that

---

[5]    Even if the jury believed Madrid only owned the 68 plants in the 24 planting holes near his trailer, after culling male plants, he would likely have about 24 plants, which would yield about 24 pounds of marijuana. Even if the jury assumed Madrid could smoke five pounds of marijuana in a year and use another five pounds for teas and rubs, his plants still would produce more than 10 pounds in excess of the most generous amount of marijuana he possibly could be expected to use for medical purposes in a year. This excess of 10 or more pounds of marijuana, in turn, could be worth $10,000 or more. The amount and value of the excess yield alone is circumstantial evidence of an intent to sell.

people sometimes obtain a recommendation to grow marijuana for medical use but intend to sell it. Given the lack of evidence that Madrid actually used marijuana on a daily basis, the jury could have deduced that he intended to sell much or all of the marijuana he planted. In addition, uprooted two-foot-tall marijuana plants were found near Madrid's trailer and partially processed marijuana was found in his trailer. Although Madrid denied the marijuana in his trailer belonged to him, the jury could have disbelieved this testimony and concluded that Madrid was in possession of the uprooted plants and partially processed marijuana. Together with the lack of any indication he was smoking or otherwise using marijuana, this could have suggested that Madrid was processing marijuana for sale, not for personal medical use. (This evidence could also undermine Madrid's testimony that he had no idea how much his plants would produce since the partially processed marijuana would provide an indication of how much bud could be harvested from a certain amount of plants or branches.)

Madrid also attempts to minimize his response to Rodriguez's hypothetical question about what he would do with any marijuana he did not use for medical purposes. His response was that he had been told he could sell it to the store or clinic. On appeal, Madrid argues that he never said what he was planning to do with the marijuana because he had no idea about the yield of his plants. He asserts his "statement is actually circumstantial evidence that [he] realized that he could only grow an amount within his recommendation limits." But this argument is appropriate for the jury, not a reviewing court. Indeed, Madrid's entire challenge to the sufficiency of the evidence appears to ask us to view the evidence in a light favorable to the defense. Our task, however, is to "review the evidence in the light most favorable to the prosecution." (*People v. Zamudio*, *supra*, 43 Cal.4th at p. 357.) Viewed in this light, the evidence was sufficient to support the jury's verdict.

14.

## II.     *Jury instruction on mistake of fact*

Madrid next contends the trial court erred in refusing the defense request for an instruction on mistake of fact.  This contention lacks merit.

### A.     *Factual background*

During a discussion of jury instructions, Madrid's attorney requested CALCRIM No. 3406, mistake of fact.  He argued that Madrid did not have a wrongful intent for the cultivation charge because he did not know how much his plants would yield.  In rejecting the request, the court stated that the only mental state or intent required for the crime of cultivation is that the defendant knew the substance he planted, cultivated, or harvested was marijuana.  The court explained a jury instruction on mistake of fact would be warranted if, for example, Madrid thought he was growing oregano or parsley, but here he admitted he was growing marijuana.

His attorney then argued that Madrid's belief that he could grow 90 plants was another mistake of fact warranting an instruction because the subpoenaed doctor's recommendation stated he could only grow 50 plants.  The court disagreed.

In addition to his request for a mistake-of-fact instruction, Madrid requested a special jury instruction modifying CALCRIM No. 2352 to recognize that a member of a cooperative may receive reimbursement for the costs associated with cultivating marijuana for medical purposes.[6]  The trial court, however, ruled there was no substantial evidence of a collective or cooperative in this case.

---

[6]     Madrid requested the following addition to CALCRIM No. 2352:  "The [CUA] allows a person to possess or cultivate marijuana for medical purposes and collectively or cooperatively cultivate marijuana for medical purposes.  A member of a cooperative may receive reimbursement for costs associated with the service that the member provides to the cooperative; however, any monetary reimbursement should be only an amount necessary to cover overhead costs and operating expenses.  Any collective or cooperative must be a nonprofit enterprise."

The additional language appears to be based on provisions of the MMP and *People v. Jackson* (2012) 210 Cal.App.4th 525, 529, which held:  "The defense the MMPA provides to patients who participate in collectively or cooperatively cultivating marijuana requires that a

In arguing for the modified instruction referencing cooperatives, Madrid's attorney stated: "I don't believe that my client knew what a collective was or what a cooperative was or what a dispensary was or any such definition. [¶] My client understood that he could legally sell it to what he referred to as a store … and a clinic …. Just because he doesn't know what it is or doesn't understand the logistics does not make such a sale illegal. [¶] If he did it as a collective, meaning join the collective …, he could have sold it to the collective legally. [¶] The fact that his statement was one of speculation as to what he would do if he had excess marijuana, that's the problem, is that it is only speculation that he would have excess marijuana, and if he did—"

The court interrupted: "[T]he problem arises that there are legal requirements to sell to a dispensary. So it's a mistake of law." The court continued: "[H]is belief that he could just sell it to a store [is] a mistake of law, even if that store is a dispensary, because he'd have to establish the—the legal aspect …."

Madrid's attorney responded: "My point is he was contemplating the legal action. The fact that he did not yet know how to go about it does not negate that he could have been contemplating a legal action. He didn't quite understand things yet, but since his statement was purely speculative, it was not time for him to be required … to understand the dotting the I's and crossing the T's." The court declined to give the requested modified instruction.

### B.     *Analysis*

On appeal, Madrid argues he had a right to an instruction that told the jury if he had a reasonable and good faith belief that he could sell any excess marijuana, that mistaken belief negated specific intent. The Attorney General responds that a

---

defendant show that members of the collective or cooperative: (1) are qualified patients who have been prescribed marijuana for medicinal purposes, (2) collectively associate to cultivate marijuana, and (3) are not engaged in a profit-making enterprise."

mistake-of-fact instruction was not warranted because Madrid never claimed to be part of cooperative that could legally dispense marijuana and his mistake was one of law. We agree with the Attorney General.

"The Penal Code sets forth the broad outlines of the mistake of fact defense. Section 26 of that code provides: 'All persons are capable of committing crimes except … [¶] ... [¶] … Persons who committed the act or made the omission charged under an ignorance or mistake of fact, which disproves any criminal intent.' Thus, for example, in a case where a defendant was convicted of murder for shooting his wife, but claimed he honestly believed the gun was not loaded, the trial court erred by refusing to instruct the jury that a person who entertains 'an honest and reasonable belief in the existence of certain facts and circumstances which, if true, would make such act and omission lawful, is not guilty of a crime.' [Citation.]" (*In re Jennings* (2004) 34 Cal.4th 254, 276, fn. omitted.) "As a general matter, however, a mistake of fact defense is not available unless the mistake disproves an element of the offense." (*Id.* at p. 277.)

"In determining whether a defendant's mistaken belief disproves criminal intent, the courts have drawn a distinction between mistakes of fact and mistakes of law. [Citation.] While a mistake of fact usually is a defense, a mistake of law usually is not. It is commonly said that ignorance of the law is no excuse. [Citation.] '[I]n the absence of specific language to the contrary, ignorance of a law is not a defense to a charge of its violation.' [Citation.] 'If the act itself is punishable when knowingly done, it is immaterial that the defendant thought it was lawful.' [Citation.] As an illustration: a defendant's ignorance of a girl's age may be a defense to statutory rape, but a defendant's ignorance of the law prohibiting sex with underage girls is no defense." (*People v. Meneses* (2008) 165 Cal.App.4th 1648, 1661–1662.)

Here, to the extent Madrid believed he could legally sell any marijuana he grew in excess of the amount he needed for medical purposes, this was a mistake of law. Ignorance of the law prohibiting the sale of marijuana is no defense. Similarly, ignorance

of the laws regulating marijuana cooperatives is not a defense.  Nor would his asserted ignorance of the law disprove Madrid's mental state of intending to sell his excess marijuana.  As a result, we find no error in the trial court's refusal to give an instruction on mistake of fact.

### *DISPOSITION*

The judgment is affirmed.

_____
                       Kane, J.

WE CONCUR

_____
Levy, Acting P.J.

_____
Poochigian, J.

18.