Filed 11/20/15  P. v. Sparks CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E059720 |
| v. | (Super.Ct.No. SICRF 11-52352) |
| ROBINN SPARKS, | O P I N I O N |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Inyo County.  John E. Dobroth, Judge. (Retired judge of the Inyo Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Paul J. Katz, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and William M. Wood, Meagan J. Beale, and Anthony Da Silva, Deputy Attorneys General, for Plaintiff and Respondent.

1

## I. INTRODUCTION

Following a jury trial, defendant and appellant, Robinn Sparks, was convicted of one count of welfare fraud (Welf. & Inst. Code, § 10980, subd. (c))[1] and 12 counts of perjury (Pen. Code, § 118, subd. (a)).[2][3] The convictions stemmed from conduct occurring over a three-year period, during which defendant understated her household income on forms she submitted to Inyo County Social Services (the Department) to obtain food stamps, and reported that some of her children were living with her when they were not. Defendant was sentenced to 90 days in jail, five years' formal probation, and ordered to pay $11,662.75 in restitution.

On this appeal, defendant raises two claims of instructional error: (1) there was an error in the instruction on mistake of fact (CALCRIM No. 3406) and (2) the jury was erroneously instructed that the People did not have to prove she knew her false statements to the Department were material in order to convict her of welfare fraud. She also claims the cumulative effect of these errors requires reversal. We conclude there was an error in

---

[1] "Whenever any person has, willfully and knowingly, with the intent to deceive, by means of false statement or representation, or by failing to disclose a material fact, . . . obtained or retained aid under the provisions of this division for himself or herself . . . the person obtaining this aid shall be punished . . . ." (Welf. & Inst. Code, § 10980, subd. (c).)

[2] All further statutory references are to the Penal Code unless otherwise indicated.

[3] "Every person who, having taken an oath that he or she will . . . declare, . . . or certify truly before any . . . person, in any of the cases in which the oath may by law of the State of California be administered, willfully and contrary to the oath, states as true any material matter which he or she knows to be false, . . . is guilty of perjury." (§ 118, subd. (a).)

CALCRIM No. 3406 and, in any event, the instruction should not have been given, but find that the error in the instruction could not have contributed to the verdicts and was therefore harmless beyond a reasonable doubt. We reject defendant's second claim of instructional error; hence, we find no cumulative error.

Defendant also claims the matter must be remanded for her to decide whether to request a court hearing to determine her "ability to pay" $1,160 in probation-related fees the trial court imposed as a civil judgment under section 1203.1b. We conclude defendant forfeited her right to a presentence ability to pay hearing by failing to request one in the trial court. Lastly, defendant claims an error in the trial court's "criminal minute order" must be corrected to "avoid future confusion," but we find no error in the minute order.

## II. FACTUAL BACKGROUND

### A. *General Background*

In 2004 or 2005, defendant began receiving public assistance in the form of food stamps, Medi-Cal, and cash aid. She applied for public assistance because she was disabled, her husband was in prison, and she resided with her four children, Jamee, James, Jeffrey, and Jessica. Before becoming disabled, defendant worked as a nurse. Two case managers, Cassandra Zucco and Jean Bigham, were defendant's primary case managers. Zucco had case management responsibility for defendant from 2006 through November 2012. During this period, defendant received food stamps and Medi-Cal.

3

As part of her continuing eligibility to receive public assistance, defendant was required to submit, on an annual basis, an updated "Statement of Facts" or "SAWS" form to the Department. A SAWS is approximately 15 pages in length and is signed by the client under penalty of perjury following the client's interview with his or her case worker. The case worker interviews the applicant, on an annual basis, and personally goes through the updated SAWS with the applicant. The applicant tells the case worker the answers to the questions, then signs the completed form under penalty of perjury. The applicant is always admonished that the SAWS is signed under penalty of perjury. Information from the handwritten SAWS statement is then input into a computer database system.

Signed at the same time as the SAWS is a form titled "Helping You Avoid Fraud." The form indicates that the recipient of the aid must immediately report any income, change in income, or family members moving into or out of the home.

In addition to the SAWS, there is a "Quarterly Eligibility/Status Report" form. This form is sent out quarterly to the client to report household income and changes in the household composition. To maintain benefits, the client is required to fill out the form and return it to the Department. The information is then logged into the system with the appropriate changes. The greater the client's income, the fewer benefits the client receives, including food stamps. A client receives more benefits if more people live in the home being supported by the client. Unless a recipient is receiving disability or social security, a case worker relies solely on the information provided by the client concerning

4

the client's income and household members.  Income and household occupants can be verified through social security and state disability.

B. *Prosecution Case—September 7, 2007 Through September 30, 2010 (the Time Period Encompassing the Charges)*

The charged counts involve the receipt of food stamps by defendant between September 2007 and September 2010.  During this period of time, defendant failed to report income received by James and Jeffrey, both of whom were reported as members of the household and receiving no income.

In an "Application for Cash Aid, Food Stamps, and/or Medi-Cal," signed under penalty of perjury by defendant on April 5, 2007, defendant lists as household members herself, her daughter Jessica, and her two sons James and Jeffrey.  The portion of the application asking for income for "everyone, including children," is left blank.  Four days later, defendant signed a SAWS under penalty of perjury which also listed Jamee, another daughter, as a resident of the household.  Defendant listed her income from two sources as being $1,509.44.  One day thereafter defendant signed a form titled "Helping You Avoid Fraud."  This form indicates that the signator must tell his or her case worker of money earned by individuals "in your household," and that "YOU MUST REPORT ANY INCOME OR CHANGE IN INCOME IMMEDIATELY."  The form, among other things, tells the signator that the case worker must be notified about individuals moving in or out of the home.  The form is signed by defendant declaring that she understands her reporting responsibilities.

5

### 1. Jeffrey Becomes Employed

On September 21, 2007, Jeffrey received his first paycheck from Bishop Automotive Center. His date of employment was September 21, 2007. He received monthly income up through May 20, 2010. His total income was $50,116.70. An investigator from the district attorney's office testified that Jeffrey told her that he moved out of defendant's house in June 2010.

Between September 21, 2007 and March 6, 2009, defendant signed under penalty of perjury five "Quarterly Eligibility/Status Report[s]," wherein she stated that no one had moved in or out of the household. As to a general question whether any "of the following [has] happened to someone in your household? [¶] . . . [¶] Started or stopped working . . . number of hours worked," the answer was "no." Within this time frame, she also signed under penalty of perjury two SAWS, wherein she listed Jeffrey as a resident of the household and that no one, including children, were working or expected to work. Additionally, during this time period she signed a "Helping You Avoid Fraud" form wherein she acknowledged that she understood her reporting duties.

### 2. James Becomes Employed

On March 7, 2009, defendant's other son, James, was hired by Bishop Automotive Center. He received monthly income up through August 31, 2010. His total income was $24,164.25.

From March 7, 2009 through October 1, 2010, defendant signed under penalty of perjury an "Application for Food Stamp Benefits"; listed as residents of the household

6

were herself, James, Jeffrey, and Jessica. In response to a request to list household income, the area of the form for the response is blank. Within the same time frame, defendant signed under penalty of perjury five "Quarterly Eligibility/Status Report[s]," wherein she stated that no one had moved in or out of the household. As to a general question whether any "of the following [has] happened to someone in your household? [¶] . . . [¶] Started or stopped working . . . number of hours worked," the answer was "no." She also signed under penalty of perjury one SAWS, wherein she listed both James and Jeffrey as residents of the household and that no one, including children, were working or expected to work. Lastly, she signed a "Helping You Avoid Fraud" form.

Exhibit 29 is an application for emergency food stamp benefits which was signed by defendant on March 3, 2009. Defendant was issued an EBT card, and its first date of use was October 9, 2009. It was for food stamps. The cards were loaded once a month. The last load date for the EBT card was September 9, 2010.

In February 2011, defendant was sent two notices relative to the overpayment of food stamps between October 1, 2007 and September 30, 2010. The overpayment was for a total amount of $15,787. The basis for finding the overpayment was that Zucco learned of the earnings of Jeffrey and James by inputting their social security numbers with various state or county agencies.

C. *Defense Evidence*

Defendant testified she understood that if there were changes in her household, or if people were receiving income or no longer receiving income, she needed to notify

7

social services within 10 days. She believed that she had given Zucco notification of all the changes in her household. Her children moved in and out of her home and she asked the case worker what she should do. She was told not to worry about it because they already had all of the information in the computer. As a result, she marked "no" on the form that dealt with whether there were any changes in the composition of the household.

When Jeffrey moved out of the house in June 2007, she called Zucco and told her that he was no longer living with her. In March 2008, after living with his girlfriend, Jeffrey moved back in for a short period of time. She did not know that her son Jeffrey had a job starting in 2007. He did not start working until September 2007.

James lived with her most of the time. He moved in and out and was gone for about three months in 2008. James moved out in 2009 to live with his sister. Defendant called the case worker when James left and when he returned. When she signed the paperwork, she believed that everything was true and honest. As to the differences between what she reported by telephone and the paperwork, Zucco told her that she need not worry about it because it had all been "handled." Based on her understanding, she did not need to inform the case worker of the income of the household occupants, because they had moved out during certain times.

The case worker just handed her forms and told her to sign them. She does not recall going through the documents she signed with the case worker.

According to defendant's testimony, she stopped receiving food stamps in February 2009 when she moved in with her parents and received notice that she was no

8

longer eligible. She did not receive food stamps from April 2009 to September 2010. At some point, and as part of the food stamp program, she got an EBT card. After February 2009, there was no reason for there to be any purchases on her EBT card.

She does not believe she signed exhibits 29 and 30, which are applications for food stamps dated March 3, 2009 and February 25, 2010, respectively. The signature on exhibit 29 is not hers and it is not her handwriting on exhibit 30. She heard Zucco's testimony about EBT transactions from October 2009 to October 2010, and she has not gotten any food stamps since February 2009. She did not use an EBT card from October 2009 through September 2010. She never gave an EBT transaction card to anyone. The card number on the EBT transaction report matches the number of her EBT card at the time of trial.

D. *Rebuttal*

Bigham testified that if defendant were to call in and say she had a change, every change would go into the system and a new statement of facts would be printed out and placed in the file. If a client leaves a personal note, it goes into the case file. During the period of time that she handled defendant's case, she does not believe that she was informed of any discrepancies regarding reported income versus what was stated on defendant's SAWS.

Zucco testified that as to telephone notifications, while it is not a perfect process and mistakes can be made, the case workers would have routinely put the information in the journal comments. She further testified that the fact that somebody reports a change

9

in the household over the telephone does not alleviate their need to report it or change it on the SAWS or quarterly eligibility forms.

## III.  DISCUSSION

A. *The Mistake of Fact Instruction Was Erroneous and Unwarranted by the Evidence, But Harmless Beyond a Reasonable Doubt*

As a general rule, a person who acts "under an ignorance or mistake of fact, which disproves any criminal intent" has not committed a crime.  (§ 26, cl. 3; see *People v. King* (2006) 38 Cal.4th 617, 622 ["As a general rule, no crime is committed unless there is a union of act and either wrongful intent or criminal negligence."].)  When applicable, the defense of mistake of fact serves to negate the intent element of a criminal offense. (*People v. Lawson* (2013) 215 Cal.App.4th 108, 115 [Fourth Dist., Div. Two] (*Lawson*).)

The defense of mistake of fact requires an actual belief in a set of circumstances which, if existent or true, would make the act charged an innocent act.  (*Lawson*, *supra*, 215 Cal.App.4th at p. 115.)  "For general intent crimes, the defendant's mistaken belief must be both actual and reasonable, but if the mental state of the crime is a specific intent or knowledge, then the mistaken belief must only be actual.  [Citations.]"  (*Ibid*.)

Both perjury and welfare fraud require the defendant to knowingly make a false statement of fact.  (See *People v Guasti* (1952) 110 Cal.App.2d 456, 464 ["The intent to swear falsely is the 'specific criminal intent' required in perjury trials."]; *People v. Camillo* (1988) 198 Cal.App.3d 981, 989, fn. 3 [welfare fraud requires knowingly making a false statement with the intent to deceive or defraud].)  Thus, as applied to

10

perjury and welfare fraud, a mistake of fact must be actual but it does not have to be reasonable.

Here, the jury was given the pattern instruction on mistake of fact, CALCRIM No. 3406, as a defense to the perjury and welfare fraud charges, but as given the instruction applied to general intent crimes because it told the jury that defendant's mistake of fact had to be reasonable. CALCRIM No. 3406 stated: "The defendant is not guilty of Counts 1-13 if she did not have the intent or mental state required to commit the crime because she *reasonably* did not know a fact or reasonably and mistakenly believed a fact. [¶] If the defendant's conduct would have been lawful under the facts as she *reasonably* believed them to be, she did not commit Counts 1-13. [¶] If you find that the defendant believed that the applications and statement of facts reflected changes she reported *and if you find that belief was reasonable*, she did not have the specific intent or mental state required for Counts 1-13. [¶] If you have a reasonable doubt whether the defendant had the specific intent or mental state required for Counts 1-13, you must find her not guilty of those crimes." (Italics added.)[4]

Defendant claims the error in instructing the jury that her mistake of fact had to be reasonable was prejudicial because it is reasonably probable that the jury would have acquitted her of perjury and welfare fraud had it not been instructed that her mistake had

_____

[4] In the pattern instruction CALCRIM No. 3406, the italicized portions of the instruction are bracketed and required to be omitted if the crime in issue requires specific intent or knowledge. (Bench Notes to CALCRIM No. 3406 (2015) p. 918 ["If the mental state element at issue is either specific criminal intent or knowledge, do not use the bracketed language requiring the belief to be reasonable."].)

11

to be reasonable.  The People concede the error in the instruction but argue (1) no instruction on mistake of fact was warranted in any event, because insufficient evidence supported it, and (2) the error in the instruction was harmless.  We agree with the People on both counts.

A court does not have a duty to instruct on the defense of mistake of fact sua sponte, but only upon a request and only if substantial evidence supports the defense. (*Lawson*, *supra*, 215 Cal.App.4th at pp. 117-118; *People v. Williams* (1992) 4 Cal.4th 354, 361-362.)  The "defense" of mistake of fact is not a true affirmative defense, because it merely asserts that the defendant did not have the mental state required to commit the crime.  (*Lawson*, *supra*, at p. 118; see *People v. Anderson* (2011) 51 Cal.4th 989, 996-998 [defense of accident is not an affirmative defense].)  As noted, the defense of mistake of fact requires an actual belief "'in the existence of circumstances, which, if true, would make the act with which the person is charged an innocent act . . . .'" (*Lawson*, *supra*, at p. 115, quoting *People v. Russell* (2006) 144 Cal.App.4th 1415, 1425-1427 [defendant's actual, if unreasonable, belief that a motorcycle had been abandoned rendered his act of taking the motorcycle innocent].)  In other words, the defendant must misperceive the facts that existed, and that misperception must render the defendant's otherwise criminal act an innocent act.

Defendant argues there was sufficient evidence to support a proper instruction on mistake of fact because, according to her testimony, she actually, if unreasonably, believed she did not have to report truthful information concerning her household

12

members and their income on the forms she submitted to the Department because she reported truthful information concerning those matters over the telephone to her case worker.  We disagree.

Defendant's testimony did not support an instruction on mistake of fact. Defendant admittedly knew the information she reported on the forms she submitted to the Department was false.  She admitted she knew the forms falsely stated that two of her children were living with her when they were not, and that the forms also failed to report income the children earned while they were living with her.  But this belief did not render her acts of knowingly making false statements on the forms innocent acts.  Indeed, defendant did not have a mistaken belief in any *facts* which, if true, would have rendered her acts of knowingly making false statements on the forms innocent acts.  Instead, her true defense was that she actually, if unreasonably, believed she was not legally required to accurately and truthfully report her household members and their income on the forms.

Thus, defendant's true defense was not mistake of fact but mistake of law.  A mistake of law occurs when a person knows the true facts but has a mistaken belief in the legal consequences of those facts.  (See, e.g., *People v. Young* (2001) 92 Cal.App.4th 229, 233-237 [defendant's assumption that the Compassionate Use Act of 1996 (Health & Saf. Code, § 11362.5) provided him with a defense to the charge of transporting marijuana "was an inexcusable *mistake of law*," not a mistake of fact].)  A mistake of law is "almost never a defense."  (*People v. Hagen* (1998) 19 Cal.4th 652, 660-661, fn. 4; *People v. Meneses* (2008) 165 Cal.App.4th 1648, 1661-1662 ["'If the act itself is

13

punishable when knowingly done, it is immaterial that the defendant thought it was lawful.'"].)  And here, the jury was instructed:  "It is not a defense to the crimes that the defendant did not know she was breaking the law or that she believed her act was lawful."  (CALCRIM No. 3407.)  Defendant's actual, if unreasonable and mistaken belief in the legal consequences of her acts of knowingly making false statements and omissions on the forms she submitted to the Department, in no way showed she did not act with the mental state required to commit welfare fraud or perjury—knowingly making a false statement or omission of fact.

Further, the error in instructing the jury on mistake of fact was harmless beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U.S. 18, 24.)  As indicated, the instruction on mistake of fact applied to general intent crimes.  The jury was told that defendant's mistake of fact, in believing she did not have to make truthful statements on the forms she submitted to the Department, had to be both actual and reasonable as opposed to simply actual.  As such, the jury was misinstructed on a defense which arguably implicated the necessary mens rea of the charged offenses.  Given this, we believe it appropriate to approach the harmless error analysis under *Chapman*.

Under *Chapman*, "we must ask 'whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."'  [Citations.] And '[t]o say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.'  [Citations.]"  (*People v. Maurer* (1995) 32 Cal.App.4th 1121,

14

1129.)  In considering whether the error was unimportant in relation to everything else the jury considered, we look to the strength of the evidence and the properly given jury instructions.  (*Yates v. Evatt* (1991) 500 U.S. 391, 405-407.)

We first note that the jury was properly instructed on the mens rea necessary for perjury and welfare fraud.  As to the intent required for perjury, the jury was instructed:  "To prove that the defendant is guilty of this crime, the People must prove that:  [¶]  . . .  [¶]  . . . When the defendant made the false statement, she intended to declare falsely while under penalty of perjury."  (CALCRIM No. 2640.)  Within this context, the jury was also told that "[if] the defendant actually believed that the statement was true, the defendant is not guilty of this crime even if the defendant's belief was mistaken."  (CALCRIM No. 2640.)

As for welfare fraud, the jury was instructed that in order to find defendant guilty the "People must prove that:  [¶]  1.  The defendant willfully and knowingly, with an intent to deceive, made false statements of fact or knowingly failed to disclose facts."  In this vein, it was further instructed that "[t]he People have the burden of proving beyond a reasonable doubt that when the defendant made a false statement of material fact or knowingly failed to disclose a material fact, that the defendant intended to deceive.  If the People have not met this burden, you must find the defendant not guilty of the crime charged in Count 1."

The jury was further instructed that "to find a person guilty of the crimes in this case, that person must not only intentionally commit the prohibited act or intentionally

15

fail to do the required act, but must do so with a specific intent. The act and the specific intent required are explained in the instruction for that crime." Lastly, the jury was instructed that the prosecution was required to prove the defendant guilty beyond a reasonable doubt, and that "[w]henever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt." (CALCRIM No. 220.)

In all, independent of any instruction on mistake of fact, the jury was clearly told that if it did not believe defendant possessed the culpable specific intent at the time she filled in and signed the forms, it was to return a verdict of not guilty. The given instruction on the mistake of fact defense was not contrary thereto.

Further, in viewing the evidence, the issue was not whether defendant's purported mistake of fact was reasonable, but whether she actually had a mistake of fact. As to this issue defendant gave inconsistent testimony. At one point she testified that, based on her understanding, she did not need to inform the case workers of the income of the household occupants because they had moved out during certain times. At another point she indicated that when she signed the documents, she believed everything in the paperwork was true and honest. She also testified her case worker told her not to worry about what was in the paperwork because it had all been "handled." Lastly, she testified that the case worker just handed her forms and told her to sign them. She did not recall going through the documents.

Based on the entire record, including all of the instructions and the evidence, it can surely be said that the error in CALCRIM No. 3406 did not contribute to the verdicts.

16

CALCRIM No. 3406 was unimportant in relation to everything else the jury considered on the question of whether defendant knowingly made false statements of fact to the Department in connection with her applications and continuing eligibility for public aid.

B. *The Jury Was Properly Instructed That, to Convict Her of Welfare Fraud, the People Did Not Have to Prove Defendant Knew Her Statements of Fact or Failure to Disclose Facts Were Material to the Department's Decision to Provide Her With Aid*

Defendant claims the trial court erroneously instructed the jury that the People did not have to prove she knew her statements of fact or failure to disclose facts to the Department were "material" to the decision to approve her application for public assistance in order to find her guilty of welfare fraud. She claims that a conviction for welfare fraud requires that she know her statements and omissions of fact were material to the giving of aid. We disagree.

Welfare and Institutions Code section 10980, subdivision (c) provides: "Whenever any person has, willfully and knowingly, with the intent to deceive, by means of false statement or representation, or by failing to disclose a material fact, or by impersonation or other fraudulent device, obtained or retained aid under the provisions of this division for himself or herself or for a child not in fact entitled thereto, the person obtaining this aid shall be punished . . . ."

The jury was accordingly instructed, in pertinent part, that in order to prove defendant guilty of the crime of welfare fraud, the People had to prove she "willfully and knowingly, with an intent to deceive, made false statements of fact or knowingly failed to

17

disclose facts," her statements of fact or failure to disclose facts were "material," and were "made to obtain government aid or to continue to receive government aid." The jury was further instructed that "information is *material* if it is probable that the information would influence the application or continued eligibility for public aid" and "[t]he People do not need to prove that the defendant knew the information in her statement was material."

As to the issue of materiality, Welfare and Institutions Code section 10980, subdivision (c) requires merely that the defendant's statements of fact or failure to disclose facts be material to her obtaining or retaining public aid. The intent element of the crime is present when the defendant obtains or retains public aid by means of knowingly and willfully making a false statement with the intent to deceive. (See *People v. Camillo*, *supra*, 198 Cal.App.3d at p. 989, fn. 3 [welfare fraud requires false statement or omission of material fact to be made knowingly or with intent to deceive or defraud].) There is no requirement that the defendant know her statements or omissions of fact, made in order to obtain or retain public aid, were material to her obtaining or retaining public aid. (See *ibid*.)

The requirement that the statement or omission of fact must be material to the defendant's obtaining or retaining public aid is part of the actus reus of the crime. It is an element that must be proved in order to establish the causal relationship between the false statement and the provision or retention of public aid, but it is unrelated to the intent element of the crime. (See *People v. Hedgecock* (1990) 51 Cal.3d 395, 407-408 [in

18

various contexts, the materiality of a statement or omission of fact is a question for the jury to determine]; *United States v. Gaudin* (1995) 515 U.S. 506, 510-511 [when materiality is an element of a crime, it is a question for the jury to determine].)

C. *No Cumulative Error*

Defendant claims the cumulative effect of the two instructional errors requires reversal. Not so. For the reasons discussed, the error in CALCRIM No. 3406, including the error in giving the instruction at all, was harmless beyond a reasonable doubt and the trial court did not err in instructing the jury that, in order to convict defendant of welfare fraud, the People did not have to prove defendant knew her statements to the Department were material to the provision of public aid. Thus here, there was only a single harmless error; there was no cumulative error. (*People v. Richardson* (2008) 43 Cal.4th 959, 1037.)

D. *Defendant Forfeited Her Right to a Court Hearing, Before Sentencing, to Determine Her Ability to Pay Probation-related Fees (§ 1203.1b)*

At sentencing, defendant was ordered to pay two probation-related fees: $200 for a presentence investigation and report and $960 for probation supervision ($20 per month for 48 months). (§ 1203.1b, subd. (a).) Defendant claims the matter must be remanded to the trial court "for [her] to decide whether to contest at a hearing her ability to pay [the] probation related-fees." She points out that the probation officer did not advise her, before she was ordered to pay the probation-related fees at sentencing, of her right to a court hearing to determine her ability to pay the fees. (§ 1203.1b, subds. (a)-(b).)

19

Remand for a presentence "ability to pay" hearing is unwarranted here. Defendant forfeited her right to such a hearing by failing to request one in the trial court *before* she was ordered to pay the probation-related fees at sentencing. After the parties filed their briefs on appeal, our state Supreme Court held, in two companion cases, that a defendant forfeits the right to a hearing to determine the defendant's ability to pay fees described in section 1203.1b, if the defendant fails to request the hearing in the trial court. (*People v. Trujillo* (2015) 60 Cal.4th 850, 858 [defendant forfeits right to hearing to determine ability to pay probation supervision fee, and presentence investigation and report fee]; *People v. Aguilar* (2015) 60 Cal.4th 862, 865 [forfeiture rule also applies to hearing to determine ability to pay attorney fees under § 987.8].)[5]

As pertinent, section 1203.1b provides that if a defendant is the subject of a presentence investigation and report, or is granted probation, the probation officer must determine the defendant's ability to pay the costs of any presentence investigation and report and of supervising the defendant on probation. (§ 1203.1b, subd. (a); *People v. Trujillo*, *supra*, 60 Cal.4th at p. 855.) The statute affords the defendant the right to a court hearing to determine the defendant's ability to pay any fees described in the statute, before the defendant is ordered to pay the fees. (§ 1203.1b, subds. (a)-(d).) To this end, the statute requires the court to order the defendant to appear before the probation officer,

---

[5] *Trujillo* and *Aguilar* addressed questions related to but not addressed in *People v. McCullough* (2013) 56 Cal.4th 589, which held that a defendant forfeits an appellate challenge to the sufficiency of evidence supporting a jail booking fee, imposed under Government Code section 29550.2, subdivision (a), if the defendant fails to object to the booking fee in the trial court. (*People v. Trujillo*, *supra*, 60 Cal.4th at p. 853.)

20

or his or her designated representative, to make an inquiry into the ability of the defendant to pay all or a portion of the fees described in section 1203.1b.  (§ 1203.1b, subd. (a).)  The probation officer must determine "the amount of payment and the manner in which the payments shall be made," based upon the defendant's ability to pay, and to "inform the defendant that the defendant is entitled to a hearing that includes the right to counsel, in which the court shall make a determination of the defendant's ability to pay and the payment amount." (*Ibid*.)  "The defendant must waive the right to a determination by the court of his or her ability to pay and the payment amount by a knowing and intelligent waiver." (*Ibid.)*

If the defendant does not waive his or her right to a court hearing to determine his or her ability to pay the fees described in section 1203.1b, and the amount to be paid, the probation officer must "refer the matter to the court for the scheduling of a hearing to determine the amount of payment and the manner in which the payments shall be made." (§ 1203.1b, subd. (b).)  The court "shall order" the defendant to pay the fees described in section 1203.1b if it finds, based on the probation officer's report, that the defendant has the ability to pay them.  (*Ibid*.)  At the hearing, the defendant has the right to be heard "in person," to present witnesses and other evidence, to cross-examine adverse witnesses, to the disclosure of adverse evidence, and to a written statement of the findings of the court or the probation officer.  (*Ibid*.)

Though defendant forfeited her right to a presentence "ability to pay" hearing, she is not without recourse if she is or becomes unable to pay the probation-related fees.

21

Subdivision (c) of section 1203.1b authorizes the court to hold "additional hearings," during defendant's probationary period, to review her ability to pay the probation-related fees. (§ 1203.1b, subd. (c); *People v. Trujillo*, *supra*, 60 Cal.4th at p. 861.) Additionally, section 1203.1b, subdivision (f) provides that, during the pendency of the judgment rendered "according to the terms" of section 1203.1b, the defendant "may petition the probation officer for a review of the defendant's financial ability to pay or the rendering court to modify or vacate its previous judgment on the grounds of a change of circumstances with regard to the defendant's ability to pay the judgment." (§ 1203.1b, subd. (f).)

*Trujillo* observed that "[t]he sentencing court as well as the probation officer thus retains jurisdiction to address ability to pay issues throughout the probationary period. Although the sentencing hearing is, in general, the proper time for a defendant to assert all available procedural and factual contentions relating to the trial court's sentencing choices, in an appropriate case a defendant's discovery of trial counsel's failure properly to advise the defendant, before the sentencing hearing, of the requirement of a waiver of a court hearing on ability to pay probation costs *may* constitute a change of circumstances supporting a postsentencing request for such a hearing." (*People v. Trujillo*, *supra*, 60 Cal.4th at p. 861, italics added.)

E. *No Modification of the Court's Criminal Minute Order is Necessary*

Probation-related costs imposed under section 1203.1b must be imposed as a civil judgment and not as a condition of the defendant's probation. (*People v. Bradus* (2007)

22

149 Cal.App.4th 636, 641-642; *People v. Hart* (1998) 65 Cal.App.4th 902, 906-907.) In orally pronouncing sentence, the court ordered that the $1,160 in probation-related fees be imposed as a civil judgment, and the fees are listed on the court's "order for payment of fines & fees" as being payable as a civil judgment.

Defendant claims, however, that "another trial court document," namely, the court's "criminal minute order" signed by defendant and filed on September 17, 2013, erroneously indicates that the $1,160 in probation-related fees are conditions of defendant's probation. Thus, defendant argues the minute order must be corrected "to avoid future confusion." We disagree.

The criminal minute order lists 12 conditions, in paragraphs numbered 1 through 12, of defendant's probation. Then, in a separate paragraph numbered "X" to indicate that it is not a condition of defendant's probation, the minute order states: "As a Civil Judgment, [defendant] is ordered to pay $20.00 Cost of Probation each month for 48 months, for a total of $960.00; pay $200.00 for Pre-Sentence Investigation and Report [section 1203.1b], all payable to the court as ordered by the court." Thus, the minute order does not confuse the civil judgment requiring payment of the probation-related fees with the conditions of defendant's probation, and does not need to be corrected.

## IV. DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING _____

23

Acting P. J.

We concur:

MILLER
                              J.

CODRINGTON
                              J.